UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FARHAD AZIMA, | ) |
| | ) |
| Plaintiff, | ) |
| | )     Case No. 1:16-CV-01948-KBJ |
| v. | ) |
| | )     ORAL HEARING REQUESTED |
| RAK INVESTMENT AUTHORITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
BY DEFENDANT RAK INVESTMENT AUTHORITY

Linda C. Goldstein (*pro hac vice*)
DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
linda.goldstein@dechert.com

D. Brett Kohlhofer (D.C. Bar No. 1022963)
DECHERT LLP
1900 K Street, N.W.
Washington, D.C.  20006
Telephone: (202) 261-3349
d.brett.kohlhofer@dechert.com

*Attorneys for Defendant RAK Investment Authority*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 3

      A.     The Parties and Their Prior Dealings ..................................................... 4

      B.     The Parties' Prior Settlement Agreement .............................................. 5

      C.     The High Court Proceedings Against Azima ......................................... 6

      D.     The Complaint in This Action .............................................................. 8

ARGUMENT ................................................................................................... 10

I.     RAKIA Is an Agency or Instrumentality of a Foreign Sovereign and the
      FSIA Does Not Provide Subject Matter Jurisdiction to Hear This Case. ........ 10

      A.     Azima Has Not Alleged Any Claim Based Upon A Commercial Activity
            of RAKIA ......................................................................................... 11

      B.     Azima Has Not Alleged Any Non-Commercial Tort that Occurred in the
            United States or Any Damage to or Loss of Property. ........................ 13

II.    The Settlement Agreement's Forum Selection Clause and the Doctrine of *Forum
      Non Conveniens* Preclude Azima From Bringing Suit in This Court. ............ 16

      A.     The Settlement Agreement Selects the Courts of England and Wales as the
            Exclusive Forum for This Dispute. .................................................... 16

      B.     The Traditional Public and Private Interest *Forum Non Conveniens*
            Analysis Also Favors Dismissal. ...................................................... 18

III.   None of the Causes of Action Alleged in the Complaint States a
      Cognizable Claim Against RAKIA. ............................................................. 21

      A.     Azima's Allegations Do Not State a Civil Claim Under the CFAA ................... 21

1.   The Complaint Does Not Allege Facts Connecting RAKIA to the Alleged Hacking of Azima's Data. ......................................................... 22

2.   Azima Does Not Identify Any Cognizable "Damage" Related to the Alleged Hacking. ............................................................... 25

3.   The Complaint Does Not Allege Which Computers Allegedly Were Hacked. ................................................................. 27

4.   The CFAA Does Not Provide for Aiding and Abetting Liability. ........... 28

B.   There Is No Cause of Action for Conversion of Intangible Property. ................ 28

C.   There Is No Cause of Action for Extortion and Azima Has Not Alleged Any Facts That Would Constitute Unfair Competition. ..................................... 29

CONCLUSION ................................................................................................................. 31

EXHIBIT INDEX ............................................................................................................. 32

# TABLE OF AUTHORITIES

**Statutes**

18 U.S.C. § 1030 ................................................................................ 21, 22, 23, 25, 26, 27, 28

28 U.S.C. § 1330 ................................................................................................................ 2

28 U.S.C. § 1602 ................................................................................................................ 2

28 U.S.C. § 1603 .......................................................................................................... 10, 12

28 U.S.C. § 1604 ............................................................................................................. 10

28 U.S.C. § 1605 .......................................................................................... 11, 12, 13, 14, 15, 16

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................ 21, 23, 24

*Asociacion de Reclamantes v. United Mexican States,*
    735 F.2d 1517 (D.C. Cir. 1984) ................................................................ 13, 14

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas,*
    134 S. Ct. 568 (2013) .................................................................................. 17, 18

*B & W Mgmt., Inc. v. Tasea Inv. Co.,*
    451 A.2d 879 (D.C. 1982) ................................................................................ 30

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................ 21, 24, 27

*BPA Int'l, Inc. v. Kingdom of Sweden,*
    281 F. Supp. 2d 73 (D.D.C. 2003) ................................................................ 20

*Bremen v. Zapata Offshore Oil Co.,*
    407 U.S. 1 (1972) ............................................................................................ 16

*Carter's of New Bedford, Inc. v. Nike, Inc.,*
    790 F.3d 289 (1st Cir. 2015) ............................................................................ 17

*Chas. S. Winner, Inc. v. Polistina,*
    No. 06-4865 (NLH), 2007 WL 1652292 (D.N.J. June 4, 2007) ............................ 26

*Cicippio v. Islamic Republic of Iran,*
    30 F.3d 164 (D.C. Cir. 1994) .................................................................... 12, 13

*Condux Intern. Inc. v. Haugum*,
 No. 08–4824 ADM/JSM, 2008 WL 5244818 (D. Minn. Dec. 15, 2008) ............................ 26

*Daskalea v. Washington Humane Soc'y*,
 480 F. Supp. 2d 16 (D.D.C. 2007) ........................................................................ 29

*De Csepel v. Republic of Hungary*,
 808 F. Supp. 2d 113 (D.D.C.2011) ........................................................................ 11

*De Letelier v. Republic of Chile*,
 748 F.2d 790 (2d Cir. 1984)................................................................................ 12, 13

*Doe v. Fed. Democratic Republic of Ethiopia*,
 No. CV 14-372, 2016 WL 3023996 (D.D.C. May 24, 2016),
 *appeal filed*, No. 16-7081 (D.C. Cir. May 24, 2016)........................................ 14, 15

*Econ. Research Servs., Inc. v. Resolution Econ., LLC*,
 No. 1:15-CV-1282 (RJL), 2016 WL 5335666 (D.D.C. Sept. 22, 2016)................................. 30

*Estate of Heiser v. Islamic Republic of Iran*,
 885 F. Supp. 2d 429, 440 (D.D.C. 2012),
 *aff'd sub nom.*, *Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013).............. 15

*Fischer v. Estate of Flax*,
 816 A.2d 1 (D.C. 2003)...................................................................................... 29

*Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*,
 No. 3:09-CV-00422-PMP, 2011 WL 2847712 (D. Nev. July 15, 2011) ............................... 28

*Furash & Co. v. McClave*,
 130 F. Supp. 2d 48 (D.D.C. 2001) ....................................................................... 28, 29

*Giordano v. UBS, AG*,
 134 F. Supp. 3d 697 (S.D.N.Y. 2015)..................................................................... 17, 18

*Glycobiosciences, Inc. v. Innocutis Holdings, LLC*,
 No. CV 12-1901 (RDM), 2016 WL 3014616 (D.D.C. May 24, 2016)............................ 17, 18

*Gulf Oil Corp. v. Gilbert*,
 330 U.S. 501 (1947).......................................................................................... 19

*Intercontinental Dictionary Series v. De Gruyter*,
 822 F. Supp. 662, 677 (C.D. Cal. 1993)................................................................. 16

*Irwin v. World Wildlife Fund, Inc.*,
 448 F. Supp. 2d 29, 35 (D.D.C. 2006) ................................................................ 19, 20

*Landmark Credit Union v. Doberstein*,
    746 F. Supp. 2d 990 (E.D. Wis. 2010).................................................................. 27

*Lans v. Adduci Mastriani & Schaumberg L.L.P.*,
    786 F. Supp. 2d 240 (D.D.C. 2011) ..................................................................... 20

*Marra v. Papandreou*,
    216 F.3d 1119 (D.C. Cir. 2000) ........................................................................... 16

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
    558 F. Supp. 2d 21 (D.D.C. 2008) ....................................................................... 19

*MedCam, Inc. v. MCNC*,
    414 F.3d 972 (8th Cir. 2005).................................................................................. 17

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ............................................................................ 11, 13

*New S. Equip. Mats, LLC v. Keener*,
    989 F. Supp. 2d 522 (S.D. Miss. 2013)................................................................ 25

*Nken v. Holder*,
    556 U.S. 418, 444 (2009) ...................................................................................... 15

*O'Callaghan v. District of Columbia*,
    741 F. Supp. 273 (D.D.C. 1990) ......................................................................... 28

*OBB Personenverkehr AG v. Sachs*,
    136 S. Ct. 390 (2015) ............................................................................................ 11

*Page v. Mancuso*,
    999 F. Supp. 2d 269 (D.D.C. 2013) ................................................................. 6, 24

*Paul v. Didizian*,
    819 F. Supp. 2d 31, 34 (D.D.C. 2011),
    *aff'd*, No. 11-7139, 2012 WL 1450083 (D.C. Cir. Apr. 11, 2012) ....................... 14

*Pearson v. Dodd*,
    410 F.2d 701 (D.C. Cir.1969), *cert. denied*, 395 U.S. 947 (1969) ........................ 29

*Persinger v. Islamic Republic of Iran*,
    729 F.2d 835 (D.C. Cir. 1984) .............................................................................. 13

*Pollard v. D.C.*,
    No. 12-CV-1010 (KBJ), 2016 WL 3248180 (D.D.C. June 9, 2016) ..................... 21

*Power Equip. Maint., Inc. v. AIRCO Power Services, Inc.*,
    953 F. Supp. 2d 1290 (S.D. Ga. 2013).................................................................. 22

*Reis, Inc. v. Spring11 LLC*,
   No. 15 Civ. 2836 (PGG), 2016 WL 5390896 (S.D.N.Y. Sept. 26, 2016) ...................... 26, 29

*Saunders v. Davis*,
   No. 15-CV-2026 (RC), 2016 WL 4921418 (D.D.C. Sept. 15, 2016) .................................... 22

*S.K. Innovation, Inc. v. Finpol*,
   854 F. Supp. 2d 99 (D.D.C. 2012) ................................................................................ 11, 12

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ............................................................................................................ 10

*Shaw v. Ocwen Loan Servicing, LLC*,
   No. 14-CV-2203 (KBJ), 2015 WL 4932204 (D.D.C. Aug. 18, 2015)................................. 24

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
   549 U.S. 422 (2007) ............................................................................................................ 19

*Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*,
   421 F. Supp. 2d 87 (D.D.C. 2006) ...................................................................................... 19

*TriTeq Lock & Sec. LLC v. Innovative Secured Sols., LLC*,
   No. 10 CV 1304, 2012 WL 394229 (N.D. Ill. Feb. 1, 2012) ........................................... 25, 26

## English Authorities

*OBG Ltd. v. Allan*,
   [2007] UKHL 21 .................................................................................................................. 29

Michael A. Jones et al., *Economic Torts*, in Clerk & Lindsell on Torts
   (21st ed. 2014)..................................................................................................................... 30

## Other Authorities

Fed. R. Civ. P. 8 ........................................................................................................................ 21

Fed. R. Civ. P. 12(b)(6)............................................................................................................. 21

## PRELIMINARY STATEMENT

Defendant Ras Al Khaimah Investment Authority ("RAKIA") is an agency of Ras Al Khaimah, one of the Emirates comprising the United Arab Emirates, and the victim of a $1.5 billion embezzlement scheme perpetrated by Dr. Khatter Massaad, its former Chief Executive Officer. Massaad now sits in a Saudi Arabian jail awaiting extradition to Ras Al Khaimah for criminal prosecution. Plaintiff Farhad Azima is a business associate of Massaad's, and is the defendant in civil proceedings brought by RAKIA in England's High Court of Justice (the "High Court Action"), where RAKIA seeks to recover several million dollars from Azima based on his own misconduct. This suit has been brought in this Court with the apparent goal of derailing RAKIA's ability to use documentary evidence of Azima's perfidy in the High Court Action.

The pretext for Azima's claim in this Court is that the evidence on which RAKIA relies in the High Court proceedings allegedly was obtained by means of illegal computer hacking, in violation of the federal Computer Fraud and Abuse Act ("CFAA"). Yet the Complaint acknowledges that Azima's documents *were publicly available on the Internet*, which is where RAKIA obtained them. Compl. ¶¶ 12, 13, 18, 24. Entirely missing from the Complaint are any concrete allegations about which computers might have been hacked, to whom they belonged, who did the hacking, where in the world they did it, or even, which documents were obtained by the hacker or hackers. The absence of these crucial details would be fatal to any claim, but they are particularly important here because of Azima's public profile. Among other ventures, Azima's businesses deliver military supplies to places such as Pakistan, Afghanistan and Iraq. He was a client of the Mossack Fonseca law firm whose files were leaked to the press in the Panama Papers exposé. An article published by The International Consortium of Investigative Journalists chronicles Azima's role in one of the transactions underlying RAKIA's claims

against him—the attempted purchase of a hotel in the Republic of Georgia from RAKIA.[1]  That article was published many months before RAKIA obtained—from the Internet—the documents that are at the heart of the High Court proceedings.  Azima also was a prominent donor to the Clinton Foundation, and the alleged hacking is said to have occurred on August 7, 2016, when the Clinton campaign was the bull's-eye for Russian-sponsored computer hacking aimed at interfering with the U.S. Presidential election.[2]  As in a classic whodunit, the list of characters who might have hacked or leaked Azima's documents is a long one.

Intriguing as it might be to speculate about how the evidence of Azima's misdeeds came to be posted on the Internet, where RAKIA found them, this Court should not seek to solve that mystery because all of Azima's spurious claims must be dismissed as a matter of law.

*First*, the Court has no jurisdiction to hear this action because RAKIA is an agency or instrumentality of the United Arab Emirates, a foreign sovereign.  As such, RAKIA is immune from suit unless Azima can establish that his claims fall within one of the statutory exceptions to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.* ("FSIA").  His Complaint does not even try to make that showing, and with good reason:  none of the statutory exceptions applies here.  Azima has not alleged that RAKIA engaged in any "commercial activity" in the United States, nor that he sustained damage to property as a result of a tort committed by RAKIA in the United States.  *See* pages 11–16, below.

_____

[1]     *See* Will Fitzgibbon, *Spies and Shadowy Allies Lurk in Secret with Help from Offshore Firm*, The International Consortium of Investigative Journalists (Apr. 5, 2016) ("ICIJ Article"), *available at* https://panamapapers.icij.org/20160405-spies-secret-offshore-companies.html.  A copy of the ICIJ Article is attached as Exhibit A to the Declaration of Linda C. Goldstein.

[2]     *See* Adam Entous, Ellen Nakashima and Greg Miller, *Secret CIA assessment says Russia was trying to help Trump win White House*, Washington Post (Dec. 9, 2016), *available at* https://www.washingtonpost.com/world/national-security/obama-orders-review-of-russian-hacking-during-presidentialcampaign/2016/12/09/31d6b300-be2a-11e6-94ac-3d324840106c_story.html?utm_term=.9aee48ef2cb9; Andrew Blake, *Researchers show link between John Podesta leak, DNC hack and Russia*, Washington Times (Oct. 20, 2016), *available at* http://www.washingtontimes.com/news/2016/oct/20/researchers-show-link-between-podesta-breach-dnc-l/.

*Second*, a mandatory forum selection clause requires Azima to bring his claims against RAKIA in the courts of England and Wales.  In the High Court Action, RAKIA seeks to use the documents it downloaded from the Internet to prove its claims against Azima for breach of a settlement agreement.  That settlement agreement consigns all disputes "arising out of, or in connection with" the agreement or its subject matter to the exclusive jurisdiction of the courts of England and Wales.  Ex. B ¶ 7.  Azima's claims are such a dispute; they concern the source of the evidence to be used in the High Court Action in support of RAKIA's claims for breach of the settlement agreement.  For this reason, and because any dispute about the evidence in the ongoing High Court Action between Azima and RAKIA will more efficiently be heard in that very action, the Court should dismiss the Complaint under the doctrine of *forum non conveniens*.  *See* pages 16–21, below.

*Third*, even if the Court could hear the claim, it still must be dismissed because Azima has failed to plead sufficient facts to establish a claim under the CFAA.  Indeed, Azima never identifies the hacked computers, never asserts that they were "protected" under the CFAA, never pleads that RAKIA accessed them, and never alleges that those unidentified computers were "damaged."  *See* pages 21–28, below.  As to the remaining common law claims, for conversion, extortion and unfair competition, neither English nor District of Columbia common law recognizes claims for conversion of intangible property or civil claims of extortion, and Azima does not plead any facts that could give rise to a claim for unfair competition.  *See* pages 28–31, below.

## STATEMENT OF FACTS

The principal facts are drawn from the Complaint, including the documents on which it relies, the High Court Action and the decrees of Ras Al Khaimah.

### A.  The Parties and Their Prior Dealings

RAKIA is a public authority of the government of Ras Al Khaimah.  It was created in 2005 by decree of Saqr Bin Mohammed Bin Salem Al Qasami, then the Emir and Ruler of Ras Al Khaimah.  Ex. C.  RAKIA is charged with "suggesting, preparing and implementing the policies, objectives and programs necessary for ensuring the economic[] development in the Emirate of Ras Al Khaimah, as well as to promote and create a suitable investment environment in the different economic[] sectors."  *Id.* Art. 2.  RAKIA is endowed with "a legal personality and will enjoy its financial and administrative independence."  *Id.* Art. 1.  The government of Ras Al Khaimah is the "sole owner" of RAKIA.  Ex. D.

Azima is a U.S. citizen living in Kansas City, Missouri.  Compl. ¶ 2.  His Complaint asserts that he "has various business interests in the United States."  *Id.*  Public reports, however, are much less anodyne:  Azima's business involves flying military supplies around the world, including to Pakistan, Afghanistan, Kuwait and Iraq;[3] his name is linked with the Iran-Contra scandal, where he was accused of providing the plane that delivered U.S. weapons to Iran;[4] and while he insists that he is a legitimate businessman, he is dogged by charges that his dealings are "shady" or "dubious."[5]  In addition, Azima was reported to be a large donor to the Clinton Foundation and Hillary Clinton's Senate and Presidential campaigns.[6]  One article based on the Panama Papers noted that Azima's name had "appeared on corporate documents of a company

---

[3]     Scott Canon, *Iranian-born KC aviation figure with colorful past appears in Panama Papers*, The Kansas City Star (May 19, 2016), *available at* http://www.kansascity.com/news/local/article78583617.html.

[4]     Jeff Gerth, *Reagan Confirms Iran Got Arms Aid; Calls Deals Vital; Secret Dealings Have Made Use Of Complex Net*, N.Y. Times (Nov. 13, 1986), *available at* http://www.nytimes.com/1986/11/13/world /reagan-confirms-iran-got-arms-aid-calls-deals-vital-secret-dealings-have-made.html?pagewanted=all.

[5]     Scott Canon, *supra*, note 3; Glenn R. Simpson, *White House Plans Safeguards As List of Dubious Donors Grows*, Wall Street Journal (Feb. 3, 1997), *available at* http://www.wsj.com/articles/ SB854928860663234500.

[6]     International Iran Times, *Iran-American pops up in Panama Papers* (Apr. 15, 2016), *available at* http://iran-times.com/iran-american-pops-up-in-panama-papers/.

that planned to buy a hotel in the nation of Georgia in 2011," Ex. A at 6, along with Houshang

Hosseinpour, who has been listed by the U.S. Treasury Department as a "Foreign Sanctions

Evader" for his "deceptive transactions for or on behalf of persons subject to U.S. sanctions

concerning Iran."[7]

### B.  The Parties' Prior Settlement Agreement

On March 2, 2016, RAKIA, Azima and a company owned by Azima, HeavyLift

International Airlines ("HeavyLift"), entered into a settlement agreement (the "Settlement

Agreement") to resolve a dispute arising from a 2007 joint venture between HeavyLift and RAK

Airways, in which RAKIA had guaranteed RAK Airways' performance.  Ex. B (Whereas

Clauses A–D).  The Settlement Agreement also acknowledged the "negotiation assistance to

RAKIA" that Azima had provided to RAKIA in the agency's efforts to seek restitution from

Massaad, RAKIA's former chief executive officer, for the $1.5 billion he had misappropriated.

*Id.* (Whereas Clause E); *see also* Compl. ¶ 6.

In the Settlement Agreement, RAKIA agreed to pay HeavyLift $2.6 million.  Ex. B.

¶ 1.1.  This payment was made "in reliance on [an] express warranty and confirmation" that

Azima and HeavyLift had in the past and would continue in the future to act "in good faith and

with the utmost professional integrity" towards RAKIA:

> Mr Azima and HeavyLift each expressly and separately warrants
> and confirms to RAKIA that he/it (respectively) has at all times
> acted in good faith and with the utmost professional integrity and
> will continue in the future to act in good faith and with the utmost
> professional integrity towards RAKIA, RAK Airways and any
> other RAK Entity.

*Id.* ¶ 3.2.  The Settlement Agreement went on to define what it meant by "act in good faith":

---

[7]     Press Release, U.S. Dep't of the Treasury, *Treasury Targets Networks Linked to Iran* (Feb. 6, 2014),
       *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl2287.aspx.

(1) participating in conduct which meets the standard expected of reasonable business persons in the context and includes acting in ways which were or are, or are likely to be, non-detrimental to the interests of RAKIA or any other RAK Entity, and (2) not encouraging others to participate in conduct which fails to meet the standard expected of reasonable business persons in the context or acting in ways which were or are likely to be detrimental to the interests of RAKIA or any other RAK Entity and (3) not participating in any illegal activity.

*Id.* The Settlement Agreement also provided a mandatory forum selection clause for "any dispute or claim arising out of, or in connection with, [the Settlement Agreement] or its subject matter or formation (including, without limitation, any contractual or non-contractual disputes, claims or obligations)"; such claims are subject "to the exclusive jurisdiction of the courts of England and Wales." *Id.* ¶ 7.

### C.  The High Court Proceedings Against Azima

On September 23, 2016, in accordance with English law, RAKIA's solicitors sent a "Letter Before Action" to Azima's U.S. counsel, which detailed breaches of Azima's warranty of good faith in the Settlement Agreement.  Compl. ¶ 12; Ex. E.[8]  The Letter Before Action recounted two transactions that had been uncovered.

First, it described Azima's role in RAKIA's efforts to sell a hotel it owned in Tbilisi, Georgia to Eurasia Hotel Holdings Limited ("Eurasia") in 2011.  *Id.*, Schedule, "Sheraton Metechi Palace Hotel."  Azima had provided brokerage and other services to RAKIA in that attempted sale, and a company he owned received a $1.562 million payment for those efforts. *Id.*  But, unknown to RAKIA, Azima and Massaad were both directors of Eurasia, Eurasia had

---

[8]      "When evaluating a motion to dismiss under Rule 12(b)(6) . . . the court may consider . . . 'documents . . . incorporated by reference in the complaint [and] documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.'"  *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013).

agreed to transfer 10 percent of its shares to Azima, and Azima had transmitted $500,000 of his $1.562 million fee to Massaad, who was then RAKIA's CEO—an outright bribe.  *Id*.

The Letter Before Action also described Azima's more recent efforts to induce RAKIA to invest in a joint venture to provide intelligence, surveillance and reconnaissance services by an airborne early warning and control system; the joint venture would involve, among other things, the purchase of four airplanes.  *Id*., Schedule, "ISR Project."  Unknown to RAKIA, Azima and his cronies intended to sell the planes to the joint venture at grossly inflated prices and pocket the proceeds; Azima made many other misrepresentations, including that the joint venture was a "licensed weapons dealer" when it was not.  *Id*.

The Letter Before Action attached the documents demonstrating Azima's misconduct, and noted that they had been "obtained . . . via publically available internet sources."  Compl. ¶ 13; Ex. E at 1.  Indeed, Eurasia was a British Virgin Islands entity set up by the Mossack Fonseca firm; documents for the Georgian hotel transaction were part of the Panama Papers cache and are described in the ICIJ Article.  Ex. A at 6–7.  The Letter Before Action demanded that Azima repay the $2.6 million that he had received under the Settlement Agreement within seven days.  Compl. ¶ 12; Ex. E at 2.

Azima did not respond to the Letter Before Action, except to seek an extension of time and to demand that RAKIA's counsel identify the websites from which the supporting documents had been obtained.  Compl. ¶ 17.  RAKIA's counsel provided links to three of the websites where RAKIA had found the information.  *Id*.; Ex. F.

Since it had received no substantive response, RAKIA filed the High Court Action against Azima in the High Court of Justice, Chancery Division in London on September 30, 2016.  Ex. G.  That action recites Azima's misconduct by means of the bribe paid to Massaad in

connection with the attempted sale of the Georgian hotel, *id.* ¶¶ 8.1–8.12, and the sham joint venture proposal, *id.* ¶¶ 8.13–8.19.  These facts provide the basis for RAKIA's claims for breach of the Settlement Agreement's warranty, *id.* ¶¶ 10–11, and fraudulent misrepresentation, *id.* ¶¶ 12–17.

Azima has retained English counsel to defend the High Court Action.  Ex. H.  His lawyers have stated that "[a]ll of our client's rights are reserved" with respect to the allegedly "illegally obtained" documents that RAKIA had downloaded from the Internet and that were the basis for the High Court Action.  Ex. H at 2.  Azima's counsel has not, however, sought to enjoin the use of those documents in the High Court Action and has not made any effort to seal the High Court's file, which is available to the public.  Azima's detailed Defence, served on December 9, 2016, does not challenge the authenticity or the source of any of the documents on which RAKIA bases its claims.  Ex. I.  Indeed, Azima admits that $500,000 was paid to Massaad (although he asserts that the money was later returned) and states that he "will rely on the full contents of" one of the allegedly hacked emails at trial.  Ex. I ¶¶ 31(b), 43.

### D.  The Complaint in This Action

The very same day that RAKIA filed the High Court Action in London, Azima filed this lawsuit in Washington, D.C. seeking, among other things, "[a] mandatory injunction requiring [RAKIA] and its agents to return to Plaintiff all electronic data and other property of Plaintiff," which would hamstring RAKIA's pursuit of the High Court Action.  *See* Compl. at 14, Prayer for Relief ¶ 4; Ex. G.  It is unclear why Azima brought this action in this Court; he lives in Missouri and the only connection the Complaint draws to Washington, D.C. is that the Letter Before Action was sent to his counsel in Washington, D.C. via email.  Compl. ¶¶ 2, 12.

The Complaint alleges that "[s]hortly after" July 23, 2016, Azima learned that unidentified "computers in the United States used by Mr. Azima had been hacked."  *Id.* ¶ 10.

Although he is coy about which computers were hacked or who owned them, Azima appears to know when the alleged hacking occurred ("on or about August 7, 2016") and how much data allegedly was obtained ("approximately 65 gigabytes (GB)"). *Id.*

Significantly, the Complaint concedes that "portions of the electronic data that had been hacked and misappropriated from Mr. Azima and his business associates on or about August 7, 2016, had been downloaded or transferred to remote websites" on the Internet. *Id.* ¶ 18; *see also* ¶ 24 ("an initial investigation has revealed that data on certain BitTorrent sites and related micro-sites, including the websites referenced by [RAKIA]'s counsel . . . is, or was derived from, data that was hacked"). Nonetheless, even though Azima appears to acknowledge that the documents attached to the Letter Before Action were publicly available to RAKIA on the Internet, he speculates that "one or more of the following is true":

- "RAKIA, directly or through its agents, caused computers located in the United States containing the confidential, internal data of Mr. Azima and his business associates to be hacked";

- "RAKIA and its agents knew or should have known that the confidential, internal data of Mr. Azima and his business associates had been hacked";

- "RAKIA and its agents caused misappropriated and stolen data of Mr. Azima and his business associates to be posted to and maintained" on Internet sites;

- "RAKIA and its agents knew or should have known that misappropriated and stolen data of Mr. Azima and his business associates had been posted to" Internet sites;

- "RAKIA and its agents accessed and/or downloaded misappropriated and stolen data of Mr. Azima and his business associates" from the Internet "knowing that such data had been misappropriated and stolen"; and

- "RAKIA and its agents, including Defendant's counsel, have knowingly, intentionally and deliberately used misappropriated and stolen data of Mr. Azima and his business associates."

Compl. ¶ 27.  If this laundry list of possibilities were a sufficient basis to plead a CFAA claim,

every news organization relying upon Wikileaks or the Panama Papers would be at risk of civil

liability or even criminal prosecution under the CFAA.

Azima's damage allegations are just as nebulous.  He contends that he has "incurred and

continues to incur costs and expenses investigating, analyzing and redressing the theft of the

data," and that he has suffered "various injuries and damages, including those resulting from the

disruption of his business."  Compl. ¶ 26.  Notably, he does not contend that the unidentified

computers, which he does not claim to own, were damaged or that he has incurred any expenses

to repair them, as is required under his CFAA cause of action.

## ARGUMENT

I.    **RAKIA Is an Agency or Instrumentality of a Foreign Sovereign and the
      FSIA Does Not Provide Subject Matter Jurisdiction to Hear This Case.**

The FSIA, which provides "'the sole basis for obtaining jurisdiction over a foreign state

in the courts of this country,'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citation

omitted), provides that a foreign sovereign's agencies or instrumentalities "shall be immune from

the jurisdiction of the courts of the United States" except as provided in that statute.  28 U.S.C.

§ 1604.  Under the FSIA, "agency or instrumentality of a foreign state" means any entity (1)

which is a separate legal person, corporate or otherwise, (2) which is an organ of a foreign state

or political subdivision thereof, or a majority of whose shares or other ownership interest is

owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a

State of the United States  nor created under the laws of any third country.  *Id.* § 1603(b).

RAKIA has each of these attributes:  it was created under the laws of Ras Al Khaimah by a

decree endowing it with a separate "legal personality," Ex. C, Art. 1; it is entirely owned by Ras

Al Khaimah, Ex. D; and it is not a citizen of the United States.

Azima presumably agrees that this case can be brought only under the FSIA, because he served RAKIA with a copy of the Complaint in accordance with the statute's singular requirements for service of process.  *See* Docket No. 6 (Clerk's Certificate of Mailing, selecting option for mailing to "the agency or instrumentality of the foreign state").  Immunity under the FSIA is "presumptive[]" "unless one of the Act's express exceptions . . . applies."  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 394 (2015).  Once the Defendant "makes a *prima facie* showing that it is a foreign state," as has been done here, a plaintiff bears the burden to "assert[] at least some facts showing that one of the FSIA exceptions applies."  *de Csepel v. Republic of Hungary,* 808 F. Supp. 2d 113, 127 (D.D.C. 2011).

Section 1605 of the FSIA supplies the only available exceptions.  Yet Azima does not mention the FSIA in his Complaint, much less identify which of the statutory exceptions contained in section 1605 might permit him to assert his claims against RAKIA in the courts of the United States.  Assuming that Azima's factual allegations are true, the only exceptions that could potentially apply would be (i) the commercial activities exception set forth in section 1605(a)(2); and (ii) the non-commercial torts exception set forth in section 1605(a)(5).  But, as demonstrated below, the facts pled in the Complaint do not fall within either of these exceptions. "[W]here, as here, [Defendant] can show that Plaintiffs' jurisdictional allegations are legally insufficient—that is, taken as true, [the] allegations fail to bring the case within any of the exceptions to immunity that they invoke—a court properly finds that it lacks subject-matter jurisdiction and must dismiss the case."  *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 108 (D.D.C. 2012) (following *Mwani v. bin Laden,* 417 F.3d 1, 15–16 (D.C. Cir. 2005)).

### A. Azima Has Not Alleged Any Claim Based Upon A Commercial Activity of RAKIA.

The commercial activities exception applies only where the plaintiff's claim:

is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2).  Each subprong of the exception requires a "commercial activity," which the FSIA defines as "a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603.  The activity's "purpose must be disregarded."  *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167 (D.C. Cir. 1994).  Rather, the FSIA mandates that an activity's "commercial character . . . shall be determined by reference to the nature of the course of conduct or . . . act."  28 U.S.C. § 1603.

The Complaint does not even attempt to identify an applicable "commercial activity" that could bring this case within the FSIA's "commercial activities" exception.  The claims are all "based upon" alleged computer hacking.  And illegal computer hacking is not, as defined in the FSIA, a "commercial activity."  "[T]he 'key inquiry' is 'not . . . whether its purpose is to obtain money, but rather whether the [conduct] is the sort of action by which private parties can engage in commerce.'"  *S.K. Innovation, Inc.*, 854 F. Supp. 2d at 112; *see De Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir. 1984) ("[N]ot every act of a foreign state that could be done by a private citizen in the United States is 'commercial activity[.]'  The court must inquire whether the activity is of the type an individual would customarily carry on for profit.") (citation omitted).

In analogous situations, the D.C. Circuit has explained that illegal activities that do not have any of the inherent qualities of commercial activity do not fall within the commercial activities exception of the FSIA.  In *Cicippio v. Islamic Republic of Iran*, for example, a group of kidnapping victims claimed that Iran's hiring of kidnappers made the kidnapping tort

- 12 -

commercial.  The court explained that "kidnapping *by itself* cannot possibly be described as an act typically performed by participants in the market (unless one distorts the notion of a marketplace to include a hostage bazaar)."  30 F.3d at 168.  As the D.C. Circuit explained, the fact that "money was allegedly sought from relatives of the hostages could not make an ordinary kidnapping a commercial act any more than murder by itself would be treated as a commercial activity merely because the killer is paid."  *Id.*; *see also Mwani,* 417 F.3d at 17 (rejecting plaintiff's attempt to characterize Afghanistan's harboring of terrorist camps as the "'paradigmatically mercantile' provision of land for money" for purposes of the commercial activity exception); *De Letelier*, 748 F.2d at 797 (kidnapping and assassination were not commercial activities).  Accordingly, Azima's claims based on alleged computer hacking cannot fall within the "commercial activities" exception contained in section 1605(a)(2) of the FSIA.

### B.  Azima Has Not Alleged Any Non-Commercial Tort that Occurred in the United States or Any Damage to or Loss of Property.

The non-commercial torts exception applies where the case is not subject to the commercial activities exception and where

> money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, *occurring in the United States* and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . .

28 U.S.C. § 1605(a)(5) (emphasis added).  The D.C. Circuit has "decline[d] to convert this into a broad exception for all alleged torts that bear some relationship to the United States." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (holding no jurisdiction for claim that Mexico failed to pay compensation for taking of land situated in Texas).  Rather, "both the tort and the injury must occur in the United States," *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984) (holding no

jurisdiction for claim of intentional infliction of emotional distress to U.S. parents of hostage held in Iran). This means "that for the exception of § 1605(a)(5) to apply 'the tortious act or omission must occur within the jurisdiction of the United States.'" *Asociacion de Reclamantes*, 735 F.2d at 1524 (citing legislative history of the FSIA). "Courts . . . have repeatedly interpreted the phrase 'occurring within the United States' to mean that the 'entire tort' must have occurred in the United States." *Doe v. Fed. Democratic Republic of Ethiopia*, No. CV 14-372, 2016 WL 3023996, at *10 (D.D.C. May 24, 2016), *appeal filed*, No. 16-7081 (D.C. Cir. May 24, 2016).

Although Azima alleges that "RAKIA, directly and/or through its agents, . . . caused computers located in the United States containing [the relevant data] to be accessed [by] hacking," Compl. ¶ 29, he does not allege where the purported hackers were when they allegedly accessed the unidentified computers containing Azima's information. This is a key jurisdictional fact, and the Court should not construe the Complaint to say more than it does. *See Paul v. Didizian*, 819 F. Supp. 2d 31, 34 (D.D.C. 2011), *aff'd*, No. 11-7139, 2012 WL 1450083 (D.C. Cir. Apr. 11, 2012) ("[A] plaintiff's factual allegations will 'bear closer scrutiny' when the district court is resolving a motion to dismiss for lack of subject matter jurisdiction as opposed to a motion to dismiss for failure to state a claim[.]"). To the contrary, Azima implies that RAKIA's supposed part in the hack was performed either in England or in the UAE. *See* Compl. ¶ 8 (alleging that Azima was "threatened" by RAKIA's solicitors from London); ¶ 25 (alleging that "at least one of the websites that contains data hacked . . . from [Plaintiff] and his business associates is hosted on computer systems in Dubai, United Arab Emirates"). The Complaint nowhere suggests that the alleged attack was conducted by persons who were physically present in the United States, as it must to defeat RAKIA's immunity under the FSIA.

Just a few months ago, Judge Moss dismissed a complaint against Ethiopia based on hacking allegations where all of the alleged acts by Ethiopia or its agents occurred outside of the United States.  *See Doe*, 2016 WL 3023996, at *10.  Judge Moss reviewed the statute, the case law, and the legislative history to conclude that the FSIA does not "permit suits against foreign sovereigns who, without setting foot on American soil, use technology to commit torts against persons located here."  *Id.* at *15.  Given the complete failure to allege that the entire alleged tort occurred in the United States, Azima cannot sue RAKIA in the courts of the United States under the non-commercial torts exception.

Further, the Complaint cannot survive the FSIA's jurisdictional bar because it alleges neither "personal injury" nor "damage to or loss of [Azima's] property"—at least one of which is required to qualify for the FSIA's non-commercial torts exception.  28 U.S.C. § 1605(a)(5).  Azima alleges no personal injury.  And while he makes generalized claims about harms to his business interests, the FSIA's plain language limits the non-commercial torts exception to only a subset of actions involving economic harm:  those that plead "damage to or loss of property."  If any economic harm were held to be actionable under section 1605(a)(5), without regard to whether it involved "damage to or loss of property," those words in the statute would be robbed of their meaning.  *See generally Nken v. Holder*, 556 U.S. 418, 444 (2009) ("'In construing a statute we are obliged to give effect, if possible, to every word Congress used.'"); *Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 440 (D.D.C. 2012) ("Every word in a statute must be given effect, including the seemingly trivial word 'of.'"), *aff'd sub nom.*, *Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013).

Here, Azima has pled neither form of damage. The Complaint asserts merely that Azima's data was copied and that this copying caused him "unfair competitive injury."  Compl.

¶ 1.  It never alleges that any computer belonging to Azima was damaged, or that he has lost any property.  Because Azima fails to plead any "damage" or "loss" to property, the non-commercial torts exception does not apply and RAKIA's sovereign immunity should remain undisturbed.  In a similar situation, where the plaintiff contended that its intellectual property had been "pirated," or copied, the Court held that "plaintiff has not suffered any 'damage to or loss of property' under the guise of its negligence claim, as required by 28 U.S.C. § 1605(a)(5)."  *Intercontinental Dictionary Series v. De Gruyter*, 822 F. Supp. 662, 677 (C.D. Cal. 1993).  This Court should reach the same conclusion here.

## II.   The Settlement Agreement's Forum Selection Clause and the Doctrine of *Forum Non Conveniens* Preclude Azima From Bringing Suit in This Court.

In their Settlement Agreement, Azima and RAKIA agreed that "any dispute or claim arising out of, or in connection with, [the Settlement Agreement] or its subject matter or formation (including, without limitation, any contractual or non-contractual disputes, claims or obligations)" would be brought only in the courts of England or Wales.  Ex. B at ¶ 7.  Because Azima's claims against RAKIA may be brought only in England or Wales, and because allowing this action to proceed in Washington, D.C. would be inefficient for the Court, the parties and the witnesses, the doctrine of *forum non conveniens* requires dismissal.

### A.  The Settlement Agreement Selects the Courts of England and Wales as the Exclusive Forum for This Dispute.

Forum selection clauses in international contracts such as the one at issue here have long enjoyed a robust presumption of validity.  *Bremen v. Zapata Offshore Oil Co*., 407 U.S. 1, 18 (1972) (forum selection clause in international contract must be enforced unless "trial in the contractual forum will be so gravely difficult and inconvenient" that resisting party "will for all practical purposes be deprived of his day in court"); *Marra v. Papandreou*, 216 F.3d 1119, 1126 (D.C. Cir. 2000) (observing the same "strong presumption in favor of the enforcement of forum-

selection clauses"). Where, as here "the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum,'" that clause should be "'given controlling weight in all but the most exceptional cases.'" *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 581 (2013) (citations omitted); *see also Glycobiosciences, Inc. v. Innocutis Holdings, LLC*, No. CV 12-1901 (RDM), 2016 WL 3014616, at *6 (D.D.C. May 24, 2016) (dismissing on *forum non conveniens* grounds claims covered by mandatory forum selection clause selecting London court). In such cases, "'the plaintiff's choice of forum merits no weight,' and 'a court evaluating a defendant's *forum non conveniens* motion based on a forum-selection clause should not consider arguments about the parties' *private* interests.'" *Glycobiosciences, Inc.*, 2016 WL 3014616, at *3 (quoting *Atl. Marine Constr. Co.*, 134 S. Ct. at 581).

Here, the Settlement Agreement signed by Azima provides that:

> This Settlement Agreement and any dispute or claim arising out of, or in connection with, it or its subject matter or formation (including, without limitation, any contractual or non-contractual disputes, claims or obligations) is governed by and shall be construed in accordance with English law and the Parties submit to the exclusive jurisdiction of the courts of England and Wales.

Ex. B ¶ 7. It is well established that the phrase "arising out of, or in connection with" should be interpreted broadly. *See Carter's of New Bedford, Inc. v. Nike, Inc.*, 790 F.3d 289, 293 (1st Cir. 2015) (describing the language as "unambiguously broad"); *MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005) (describing the language as "broadly worded"); *Giordano v. UBS, AG*, 134 F. Supp. 3d 697, 703 (S.D.N.Y. 2015) (describing same language as "broad [and] inclusive").

This dispute concerns the source of the documents by which RAKIA will prove Azima's breach of the Settlement Agreement in the pending High Court Action. It both "arises out of,"

and is asserted "in connection with" the Settlement Agreement that Azima breached when he

falsely warranted that he had previously dealt, and would in the future deal, with RAKIA in good

faith.  The dispute is also asserted in connection with the "subject matter" of the Settlement

Agreement, because Azima asserts that the alleged hacking arose from RAKIA's failed

settlement discussions with Massaad, which Azima had mediated.  Compl. ¶¶ 7–10.  The forum

selection clause covers the full range of torts and statutory claims asserted in the Complaint

because it governs both "contractual or non-contractual disputes, claims or obligations."  Finally,

the clause mandates that such claims be brought only in England or Wales because Azima agreed

to "submit [these disputes] to the exclusive jurisdiction of the courts of England and Wales."  Ex.

B ¶ 7.  *See Glycobiosciences, Inc.*, 2016 WL 3014616, at *6 (concluding that the forum selection

clause was mandatory because it "include[d] . . . language evincing the parties' intent to preselect

an exclusive forum"); *Giordano*, 134 F. Supp. 3d at 703 (explaining that a forum selection clause

was mandatory because it stated that "'the exclusive place of jurisdiction' for any disputes 'shall

be Geneve.'").

The Complaint does not identify any reason that Azima's claim should be litigated in

Washington, D.C., much less the "exceptional" grounds that the Supreme Court requires to

displace a valid forum selection clause.  *Atl. Marine Constr. Co.*, 134 S. Ct. at 581;

*Glycobiosciences*, 2016 WL 3014616, at *3.  Accordingly, the Complaint should be dismissed.

### B.  The Traditional Public and Private Interest *Forum Non Conveniens* Analysis Also Favors Dismissal.

The result should not change, even if the Court reaches the traditional *forum non*

*conveniens* analysis.  The English forum is necessarily adequate since Azima selected it in his

settlement agreement with RAKIA and he has engaged counsel there, who is participating in the

pending High Court Action and who has reserved all rights regarding the documents that RAKIA

downloaded from the Internet. *Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 103 (D.D.C. 2006) ("[P]laintiffs' decision to use these very same Columbian courts to bring a breach of contract claim suggests very strongly that it is an adequate forum."), *aff'd*, 487 F.3d 928 (D.C. Cir. 2007).  While courts often defer to the plaintiff's choice of forum, less deference is owed to Azima, a Missouri resident, because "the plaintiff's choice is not [his] home forum[.]" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007). And the overwhelmingly international characteristics of this case mean that both the private and public interest factors favor dismissal in favor of the ongoing High Court Action in England.

The pertinent public interest factors in the *forum non conveniens* analysis are: (1) administrative difficulties caused by foreign litigation congesting local court dockets; (2) local interest in having localized controversies decided at home; and (3) avoiding unnecessary problems in choice-of-law and the application of foreign law.  *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 35 (D.D.C. 2006) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09 (1947)) (reciting factors); *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 34 n.8 (D.D.C. 2008) (noting that "the [typical] third public interest factor [relating to juries] has no bearing on cases involving the FSIA").  The "private interest" factors include:  (1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost for obtaining attendance of willing witnesses; (4) the possibility of inspecting the premises, if appropriate; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive.  *MBI Grp., Inc.*, 558 F. Supp. 2d at 32 (reciting factors).  Taken together, the factors strongly favor dismissal here.

"The administrative difficulties of trying this case 'in a forum thousands of miles away from the majority of witnesses and the evidence are obvious.'"  *Irwin*, 448 F. Supp. 2d at 35

(citation omitted).  There is nothing localized about the case.  No relevant events occurred in the District; nor are there any witnesses or evidence here.  *See BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003) (finding that the factors "strongly support[ed] dismissal" where "[n]one of the events and none of the parties has a connection with Washington, D.C., except Sweden which has an Embassy here.").  RAKIA's Letter Before Claim was prepared by lawyers in England, not in Washington, D.C.  This Court likely would not be able to compel the attendance of witnesses from overseas, and willing witnesses would face significant expense by attending a proceeding in Washington, D.C. that ultimately relates to RAKIA's use of evidence in the pending High Court Action.  *See Irwin*, 448 F. Supp. 2d at 35 ("The availability of process for unwilling witnesses is also a primary concern to the Court . . . .  [T]here is no evidence that any of these potential witnesses reside in the United States.  None of these individuals are subject to subpoena power of this or any other United States court, and none can be compelled to attend trial.").

The issue of foreign sovereign immunity also favors the High Court Action.  While RAKIA is immune to suit in the courts of the United States (as demonstrated in Part I, above), it has agreed to submit disputes arising under the Settlement Agreement to the courts of England and Wales.  Moreover, since the same Settlement Agreement that selects an English forum also selects English law, the proceeding would likely involve interpretation of that country's law.  The High Court Action is thus the preferred venue for this dispute.  *See Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 300 (D.D.C. 2011) ("It is preferable that a case be tried by the court most familiar with the law to be applied.").

In sum, even if the forum selection clause in the Settlement Agreement did not cover this dispute—which it does—the doctrine of *forum non conveniens* would support dismissal in favor

of London, where the High Court will try RAKIA's claim that Azima breached the Settlement Agreement based on the same evidence that is the subject of this dispute.

### III.   None of the Causes of Action Alleged in the Complaint States a Cognizable Claim Against RAKIA.

Even if Azima could litigate his claims against RAKIA in this Court, each of the claims alleged in the Complaint must be dismissed under Fed. R. Civ. P. 12(b)(6).

### A.  Azima's Allegations Do Not State a Civil Claim Under the CFAA.

The Court should hold Azima to the pleading standards of Fed. R. Civ. P. 8.  Although "detailed factual allegations" are not required, *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), Azima must plead enough facts to make the claim plausible on its face, *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  The allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  "'[M]ere conclusory statements' alleging misconduct are not enough; the plaintiff must provide 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'"  *Pollard v. D.C.*, No. 12-CV-1010 (KBJ), 2016 WL 3248180, at *4 (D.D.C. June 9, 2016) (citations omitted) (alteration in original).  The Complaint fails this standard.

In Count One, Azima alleges that, "RAKIA, directly and/or through its agents, . . . caused computers containing the internal and confidential electronic data of Mr. Azima to be accessed and damaged in violation of [Section 1030(a)(5) of the CFAA], by . . . hacking into those computers for the purpose of stealing and misappropriating the . . . data[.]"  Compl. ¶ 29.  This rote recitation fails because it is not supported by the pleaded facts, which establish only that RAKIA downloaded documents that were publicly available on the Internet.  None of the factual allegations supports the rank speculation that RAKIA had a role in putting them there.  In

addition, Azima fails to allege any cognizable damage, as the CFAA requires, and fails even to identify which computers allegedly were hacked.

### 1. The Complaint Does Not Allege Facts Connecting RAKIA to the Alleged Hacking of Azima's Data.

Section 1030(a)(5)(B)–(C) of the CFAA apply only where a defendant has "accesse[d] a protected computer without authorization."[9]  18 U.S.C. § 1030(a)(5)(B)–(C).  Courts reviewing claims under the CFAA have made clear that for civil liability to attach a defendant must "actually access the information, not merely receive it from a third party."  *Power Equip. Maint., Inc. v. AIRCO Power Services, Inc.*, 953 F. Supp. 2d 1290, 1297 (S.D. Ga. 2013) (finding former employer's allegation that former employee used employer-provided credentials to access a paid third-party database insufficient to state a CFAA claim because "th[e] allegation d[id] not even include any access . . . by [d]efendant]").  Downloading documents from the Internet does not involve the "access" required to violate the statute.  *See generally* 18 U.S.C. § 1030(a)(1) –(7).

But the Complaint *never* alleges that RAKIA "accessed" the computers that Azima asserts were hacked.  Indeed, the Complaint never alleges who actually accessed the information.  Instead, it concludes that RAKIA somehow "caused" these computers "to be accessed."  Compl. ¶ 29.  Under Section 1030(a)(5)(B)–(C), however, merely "causing" a computer to be accessed is insufficient.  *Compare* 18 U.S.C. § 1030(a)(5)(A) ("[w]hoever . . . knowingly causes the transmission of a program, information, code or command . . ."), *with id.* §§ 1030(a)(5)(B)–(C)

---

[9]      Azima does not plead that RAKIA violated any specific subsection of section 1030 of CFAA, which is itself ground to dismiss his claim.  *See Saunders v. Davis*, No. 15-CV-2026 (RC), 2016 WL 4921418, at *13 (D.D.C. Sept. 15, 2016) (dismissing plaintiff's claims under the CFAA and noting that "Section 1030 contains seven subsections that describe separate violations [and the plaintff] does not elaborate on the elements of any subsection, or suggest which he believes is implicated in this case").  In this memorandum, we assume that Azima purports to state a claim under either Section 1030(a)(5)(B) or (C).

("[w]hoever . . . intentionally accesses").  If Congress had intended to prohibit "causing" a

computer to be accessed, it knew how to say so.

Even if, however, Section 1030(a)(5) did allow a claim for merely "causing" a computer

to be accessed, the Complaint still would fall short because Azima has pled no facts to support

this bare legal conclusion.  *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders

'naked assertion[s]' devoid of 'further factual enhancement.'").  The Complaint infers that,

because RAKIA's legal counsel reported that he "obtained [the documents] via publicly

available internet sources," Compl. ¶ 12, "it appears highly likely that [RAKIA] . . . had been

involved in the original hacking . . ." *id.* ¶ 13.  The inference, however, is pure conjecture and

surmise.  Azima asserts that "[t]he nature and extent of the hacking . . . strongly indicates that the

[hacker was] highly skilled technologically and employed sophisticated hacking methods."  *Id.*

¶ 11.  But he does not allege any facts suggesting that RAKIA or its agents has the requisite

technological skills to have hacked the unidentified computers.  To the contrary, Azima suggests

that RAKIA and its agents were not sophisticated enough to have downloaded the documents

from the Internet, for they are allegedly located on "BitTorrent" sites that are purportedly

difficult to locate.  *Id.* ¶¶ 18–23.  But a simple Google search for "Farhad Azima" gives the lie to

this allegation, for it identifies numerous "BitTorrent" sites containing documents about him.

Ex. J at 10, 12, 28, 29 (showing websites containing "torrent" in their URLs).

This Court may "draw on its judicial experience and common sense" in determining

whether Azima's claim that RAKIA caused computers that he used to be hacked is plausible.

*Iqbal*, 556 U.S. at 679.  The purported (and demonstrably untrue) difficulty of locating the

Internet sites containing Azima's documents cannot generate a plausible inference that RAKIA

caused any computers to be unlawfully accessed by anyone.  Rather, RAKIA's possession of

Azima's documents is "not only compatible with, but indeed was more likely explained by" downloading them from the Internet, which does not violate the CFAA, rather than any illicit computer hacking.  *Id*. at 680.  Ultimately, Azima's "general contentions" offer nothing to bring the CFAA claim into the realm of plausibility.  *See Shaw v. Ocwen Loan Servicing, LLC*, No. 14-CV-2203 (KBJ), 2015 WL 4932204, at *1 (D.D.C. Aug. 18, 2015) ("Plausibility 'is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)).

Furthermore, the plausibility of Azima's allegations that RAKIA somehow caused the unnamed computers to be accessed is undercut by other facts that are in the public record.  The Panama Papers, 11.5 million pages of documents belonging to the Mossack Fonseca law firm that Azima hired to incorporate at least some of his offshore entities, include documents about Azima and Eurasia.  And Azima's well-known ties to the Clinton Foundation would have made him the target of the same hackers who accessed the computers of the Democratic National Committee, John Podesta and other Clinton associates, particularly since the hacking purportedly occurred on August 7, 2016, one week after the Democratic Convention.  Whether viewed on its own or in the context of Azima's own notoriety, the speculation that it was RAKIA who accessed unidentified computers used by Azima fails to meet the pleading standards of *Iqbal* and *Twombly*.  *See Page*, 999 F. Supp. 2d at 283–85 (complaint's repeated conclusory statements, its "fail[ure] to indicate the particular legal grounds for th[ose] assertion[s]," and its failure to draw any connection to the defendant cause it to "clearly miss the *Iqbal* and *Twombly* pleading-standard mark").

## 2. Azima Does Not Identify Any Cognizable "Damage" Related to the Alleged Hacking.

Azima has also failed to plead any cognizable "damage." This is fatal to the claim because civil claims under the CFAA are available only to those who suffer a "damage or loss" in the amount of at least $5,000 in any one-year period by reason of "a violation of this section." *Id.* § 1030(g) (referencing *id.* § 1030(c)(4)(A)). The "violations" that Azima asserts under section 1030(a)(5) are more specific: each of them requires "damage" rather than a mere "loss" to make out a violation. *See id.* § 1030(a)(5)(A)–(C) (each requiring a "damage"). The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). "In construing the term 'damage,' courts have consistently held that 'damage' refers to 'the destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system.'" *New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 529 (S.D. Miss. 2013) (citation omitted) (dismissing CFAA claim where employee had copied data from employer's computers).

Azima does not allege any "damage" as defined by the CFAA. Instead, Azima claims only that he "has incurred and continues to incur costs and expenses investigating, analyzing and redressing the theft *of the data*." Compl. ¶ 26 (emphasis added); *id.* ("The costs, expenses and damages that [the plaintiff] has already incurred *relating to and arising from the theft of data* exceed [$100,000].") (emphasis added). But "theft of data" is not cognizable "damage" under the CFAA. *See TriTeq Lock & Sec. LLC v. Innovative Secured Sols., LLC*, No. 10 CV 1304, 2012 WL 394229, at *6 (N.D. Ill. Feb. 1, 2012) (holding that plaintiff insufficiently alleged "damage" under the CFAA when it alleged only that the defendant had "obtained and caused the transmission of [the plaintiff's] trade secrets and confidential information"); *Condux Intern. Inc.*

*v. Haugum*, No. 08-4824 ADM/JSM, 2008 WL 5244818, at *7 (D. Minn. Dec. 15, 2008) (CFAA's definition of "damage" requires "some diminution in the completeness or usability of data or information on a computer system").

Even if Azima could establish a violation of the CFAA by alleging a mere "loss," he has not properly alleged any "loss" as defined by the statute.  The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]"  18 U.S.C. § 1030(e)(11).  Azima has not suffered a cognizable "loss," because he has alleged only that he suffered harm "relating to and arising *from the theft of . . . data*[.]"  Compl. ¶ 26 (emphasis added).  Indeed, Azima has not even alleged that the data was taken from *his* computer system.  *See TriTeq Lock & Sec. LLC,* 2012 WL 394229, at *7 (finding that the plaintiff "failed to allege that it suffered any 'loss' under the CFAA" where it "ha[d] not alleged that the costs it incurred followed a CFAA offense that damaged its computers or computer systems, or that its service was interrupted").

Similarly, Azima cannot claim that he suffered a loss "from the disruption of his business."  Compl. ¶ 26.  Consequential damages may be a recoverable "loss" only when they are "incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  Azima has alleged no such interruption.  *See Reis, Inc. v. Spring11 LLC*, No. 15 Civ. 2836 (PGG), 2016 WL 5390896, at *9 n.4 (S.D.N.Y. Sept. 26, 2016) (holding there was no CFAA claim for damages where "Plaintiffs do not allege any interruption of service."); *see also Chas. S. Winner, Inc. v. Polistina*, No. 06-4865, 2007 WL 1652292, at *4 (D.N.J. June 4, 2007) (finding that plaintiffs failed to allege "loss" where they "simply stated that they hired a computer expert without

providing the type of investigation or description of how the computer system was interrupted, damaged, or restored").

For this reason too, Azima's CFAA claim must be dismissed.

### 3. The Complaint Does Not Allege Which Computers Allegedly Were Hacked.

The Complaint does not even mention the most basic element of a claim under CFAA— which computer was unlawfully accessed.  Rather, the Complaint refers only to unidentified computers belonging to unidentified persons that Azima "used."  Compl. ¶ 10.  Such ambiguity is fatal because Azima must prove that the computer at issue was a "protected computer."  "In order to establish a violation of the CFAA premised on conduct entailed in Section 1030(a)(5)[], the plaintiff must plead that the defendant was using a 'protected computer.'"  *Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990, 994 (E.D. Wis. 2010).  The relevant definition of "protected computer" under the CFAA is a computer "which is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2).  Although the Complaint gives lip service to this element by reciting that "the computers that contained the . . . data of [Plaintiff] . . . were used in, or affected, interstate commerce," Compl. ¶ 30, the law requires that he do more than just re-state the statutory definition of a "protected computer."  *See Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do[.]"); *see generally Landmark Credit Union*, 746 F. Supp. 2d at 994 (criticizing the complaint's lack of specificity regarding the alleged hacking).  He cannot satisfy this element if he cannot even identify the computer(s) at issue.

Azima similarly fails to plead that the computer(s) which contained his documents were accessed "without authorization."  *See* 18 U.S.C. § 1030(a)(5)(B) & (C) (forbidding access to a protected computer "without authorization").  Instead, Azima merely alleges that "*data was*

stolen and misappropriated without [his] consent or permission."  Compl. ¶ 27.a (emphasis

added).  This is insufficient because sections 1030(a)(5)(B) and (C) prohibit unlawful access to a

computer, not misappropriation of data.  Similar to his failure to plead a "protected computer,"

Azima cannot plausibly assert that access to computers was unauthorized, without at least

identifying the computers and who owned them.  Indeed, under Azima's apparent formulation of

the rule, even an internal leak of his documents by an authorized computer user would be a

violation.  But the plain language of sections 1030(a)(5)(B) and (C) does not support this theory.

### 4.  The CFAA Does Not Provide for Aiding and Abetting Liability.

Count Two of the Complaint alleges that RAKIA aided and abetted unidentified persons

in accessing and damaging protected computers.  Compl. ¶¶ 34–39.  This Count must be

dismissed because the CFAA does not create a cause of action for aiding and abetting.  *Flynn v.*

*Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, No. 3:09-CV-00422-PMP,

2011 WL 2847712, at *3 (D. Nev. July 15, 2011) ("Section 1030 does not provide for aiding and

abetting liability.").

### B.  There Is No Cause of Action for Conversion of Intangible Property.

Counts III and IV of the Complaint seek damages, respectively, for conversion and for

aiding and abetting conversion.  Both counts should be dismissed for failure to state a claim.

The District of Columbia does not recognize a cause of action for the conversion of

intangible property.  Under the District's common law, "[c]onversion is the unlawful exercise of

ownership, dominion, or control over the personal property of another in denial or repudiation of

that person's rights thereto."  *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001);

*see also O'Callaghan v. District of Columbia,* 741 F. Supp. 273, 279–280 (D.D.C. 1990)

(reciting same elements and finding the District liable for conversion where its program to

secretly store stolen vehicles, which had been recovered, deprived plaintiff her vehicle for nearly

four months).  Courts in the District have long held that there is "[n]o[] . . . claim for conversion whe[re] [the plaintiff] retains originals or other copies of documents another improperly uses because the owner is not deprived of the beneficial use of the information."  *Furash & Co.*, 130 F. Supp. 2d at 58 (D.D.C. 2001) (citing *Pearson v. Dodd,* 410 F.2d 701, 706 (D.C. Cir. 1969), *cert. denied,* 395 U.S. 947 (1969)).  For example, in *Pearson v. Dodd*, the D.C. Circuit concluded there was no claim for conversion when two Senate employees copied and leaked a Senator's documents without depriving the Senator of the use of the documents.  410 F.2d at 706; *see also Furash & Co*., 130 F. Supp. 2d at 58; *Reis, Inc.*, 2016 WL 5390896, at *10 (no conversion where defendant's download of documents "did not deprive Plaintiffs of their ability to access or create copies of" those documents).

English law, which governs disputes arising under the Settlement Agreement, is in accord.  *See OBG Ltd. v. Allan* [2007] UKHL 21 (attached as Ex. K), where a majority of the House of Lords held that there can be no conversion of incorporeal assets.

Here, Azima does not allege that he was unable to use any of his documents or that was deprived of any tangible good.  As a result, Azima fails to state a claim for conversion or, necessarily, for aiding and abetting conversion.

### C. There Is No Cause of Action for Extortion and Azima Has Not Alleged Any Facts That Would Constitute Unfair Competition.

Count V of the Complaint seeks damages for "unfair competition and extortion."  Compl. ¶¶ 52–57.  This count also fails to state a claim.

First, it is well settled that the District's common law does not recognize a civil cause of action for extortion.  *Fischer v. Estate of Flax*, 816 A.2d 1, 5 (D.C. 2003) (no authority "recognizing a civil cause of action for extortion in this jurisdiction, and it has been rejected elsewhere"); *Daskalea v. Washington Humane Soc'y*, 480 F. Supp. 2d 16, 39 (D.D.C. 2007)

("[T]he District of Columbia does not recognize a civil cause of action for extortion.") (citation omitted).

Second, the District recognizes only a "limited" cause of action for "unfair competition." *See Econ. Research Servs., Inc. v. Resolution Econ., LLC*, No. 1:15-CV-1282 (RJL), 2016 WL 5335666, at *6 (D.D.C. Sept. 22, 2016).  Actionable conduct includes "defamation, disparagement of a competitor's goods or business methods, intimidation of customers or employees, interference with access to the business, threats of groundless suits, commercial bribery, inducing employees to sabotage, [and] false advertising or deceptive packaging likely to mislead customers into believing goods are those of a competitor."  *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C. 1982).  The District's Court of Appeals has rejected attempts to extend the tort beyond these traditional bounds.  *Id*.  Azima has failed to allege that any actions by RAKIA fit into one of this tort's established categories—all of which relate to business competitors and suffering meaningful injury in a traditional competitive setting.  Aside from yet another conclusory statement—that "RAKIA competes in several respects with businesses owned and operated by [Plaintiff] and his business interests," Compl. ¶ 3—Azima identifies no specific ways in which RAKIA competes with him, and thus fails to identify how he could have been competitively harmed.

English common law is even more restrictive.  "[T]he common law has refused to embrace a tort of 'unfair competition', even where one person intends harm to his rival's economic interests."  Michael A. Jones et al., *Economic Torts*, in Clerk & Lindsell on Torts 1688, 1689–90 (21st ed. 2014) (attached as Ex. L).  Regardless of whether English law or local law governs Count V, it fails to state a legal claim against RAKIA.

## CONCLUSION

For the reasons set forth above, and in the accompanying declaration of Linda C.

Goldstein, the Complaint against RAKIA should be dismissed in its entirety with prejudice.

Dated:  December 12, 2016.                    Respectfully submitted,


 /s/ Linda C. Goldstein      
Linda C. Goldstein (*pro hac vice*)
DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
linda.goldstein@dechert.com

D. Brett Kohlhofer (D.C. Bar No. 1022963)
DECHERT LLP
1900 K Street, N.W.
Washington, D.C.  20006
Telephone: (202) 261-3349
d.brett.kohlhofer@dechert.com

*Attorneys for Defendant RAK Investment*
*Authority*

# EXHIBIT INDEX

Will Fitzgibbon, *Spies and Shadowy Allies Lurk in Secret with Help from Offshore Firm*, The International Consortium of Investigative Journalists, (Apr. 5, 2016) .................................. A

Settlement Agreement among Farhad Azima, HeavyLift International Airlines and RAKIA, (Mar. 2, 2016) .................................................................................................................... B

Emiri Decree No. 2 by Saqr Bin Mohammed Bin Salem Al Qasami, former Emir and Ruler of Ras Al Khaimah, with an English translation of the Decree (2005) ........................................ C

Letter from Ahmad Mohammad Al Khatri, Chairman of the Court Department and Member of the Judicial Council of the Government of Ras Al Khaimah ........................................................ D

"Letter Before Action" from David Hughes of Dechert LLP (London) to Kirby Behre of Miller & Chevalier (Washington, D.C.), with its exhibits, (Sept. 23, 2016) ............................ E

Email sent from David Hughes of Dechert LLP (London) to Kirby Behre of Miller & Chevalier (Washington, D.C.), (Sept. 29, 2016) ........................................................................ F

Claim Form and Particulars of Claim, with its exhibits, filed by RAKIA against Farhad Azima in the High Court of Justice, Chancery Division (London) (Sept. 30, 2016) ............................... G

Letter from Berwin Leighton Paisner LLP (London) to Dechert LLP (London), (Oct. 24, 2016) ...................................................................................................................... H

Defence of Farhad Azima in the High Court of Justice, Chancery Division (London) (Dec. 9, 2016) ....................................................................................................................... I

Results of a Google search for the phrase "Farhad Azima," (run Dec. 7, 2016) ..................................................................................................................... J

*OBG Ltd. v. Allan,* [2007] UKHL 21 ................................................................................................................... K

Michael A. Jones et al., *Economic Torts*, in CLERK & LINDSELL ON TORTS 1688, 1688–1691, (21st ed. 2014) ...................................................................................................................... L

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 12, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of electronic filing to the following:

> Kirby D. Behre (D.C. Bar No. 398461)
> Timothy O'Toole (D.C. Bar No. 469800)
> Charles F. McAleer (D.C. Bar No. 388681)
> Miller & Chevalier Chartered
> 900 16th Street, N.W.
> Washington, D.C. 20006
> Tel:   (202) 626-5800
> Fax:  (202) 626-5801
> Email:  kbehre@miclchev.com
> Email:  totoole@milchev.com
> Email:  cmcaleer@milchev.com

>   /s/ D. Brett Kohlhofer
> D. Brett Kohlhofer (D.C. Bar No. 1022963)
> DECHERT LLP
> 1900 K Street, N.W.
> Washington, D.C.  20006
> Telephone: (202) 261-3349
> d.brett.kohlofer@dechert.com

> *Attorneys for Defendant RAK Investment Authority*