# EXHIBIT G



## Claim Form

**In the** HIGH COURT OF JUSTICE
~~CHANCERY~~

**Fee Account no.**

**Help with Fees -**
**Ref no.** (if applicable)   H W F –          –

You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.

Claim no.   HC-2016-002798

Issue date   30-09-2016



| For court use only |

Claimant(s) name(s) and address(es) including postcode
RAS AL KHAIMAH INVESTMENT AUTHORITY
PO BOX 31291
RAS AL KHAIMAH
UNITED ARAB EMIRATES

Defendant(s) name and address(es) including postcode
FARHAD AZIMA
5921 WARD PARKWAY
KANSAS CITY
MISSOURI 64113, USA
Brief details of claim

The Claimant seeks damages of US$2,600,000 for breach of contract, alternatively for deceit, together with interest pursuant to section 35A of the Senior Courts Act 1981.

Details of the claim together with the claim for interest are set out in the attached particulars of claim.

# MASTER
# CLARK

Value

US$2,699,840 or its sterling equivalent, which at the rate of GBP:USD 1:1.30 is the sum of £2,076,800 (inclusive of interest) at the date of issue.

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

| Defendant's name and address for service including postcode | FARHAD AZIMA 5921 WARD PARKWAY KANSAS CITY MISSOURI 64113 UNITED STATES OF AMERICA | | |
|---|---|---|---|
| | Amount claimed | 2,699,840.00  £2,076,800 | |
| | Court fee | 10,000.00 | |
| | Legal representative's costs | TBC | |
| | **Total amount** | TBC | |

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

N1 Claim form (CPR Part 7) (06.16)

© Crown Copyright 2016

| Claim No. | |
|-----------|--|

Does, or will, your claim include any issues under the Human Rights Act 1998?  ☐ Yes  ☑ No

Particulars of Claim (attached)(to follow)
ATTACHED

**Statement of Truth**

~~*(I believe)~~(The Claimant believes) that the facts stated in these particulars of claim are true.

* I am duly authorised by the claimant to sign this statement

Full name  DAVID GRAHAM HUGHES

Name of claimant's legal representative's firm  DECHERT LLP

signed _____  position or office held  PARTNER

~~*(Claimant)(Litigation friend)~~
(Claimant's legal representative)                    (if signing on behalf of firm or company)

*delete as appropriate*

DECHERT LLP
160 QUEEN VICTORIA STREET
LONDON EC4V 4QQ

DX: 30 LONDON
REF:976749/137564

Claimant's or claimant's legal representative's
address to which documents or payments
should be sent if different from overleaf including
(if appropriate) details of DX, fax or e-mail.

**IN THE HIGH COURT OF JUSTICE**                    Claim No: HC-

**CHANCERY DIVISION**

BETWEEN:

## RAS AL KHAIMAH INVESTMENT AUTHORITY

*Claimant*

- and -

## FARHAD AZIMA

*Defendant*

---

### PARTICULARS OF CLAIM

---

#### THE PARTIES

1.  The Claimant ('**RAKIA**') is the investment authority of the Emirate of Ras Al Khaimah, and has its office address at Ras Al Khaimah, United Arab Emirates, P.O. Box 31291.

2.  The Defendant ('**Mr Azima**') is an individual resident in the United States of America, whose current or last known address is 5921 Ward Parkway, Kansas City, Missouri 64113.

#### THE SETTLEMENT AGREEMENT

3.  Mr Azima is the 100% shareholder in HeavyLift International Airlines ('**HeavyLift**'), a company incorporated in the United Arab Emirates with its office address at Sharjah, United Arab Emirates, PO Box 9061.  HeavyLift was purportedly struck off the register of Sharjah free zone of companies around April 2013.

4.  On 2 March 2016, RAKIA entered into a written settlement agreement with Mr Azima and purportedly HeavyLift (the '**Settlement Agreement**'). A true copy of the Settlement Agreement is appended to these Particulars of Claim at appendix 1.

5.  Pursuant to clause 3.2 of the Settlement Agreement, each of Mr Azima and purportedly HeavyLift expressly and separately warranted and confirmed to RAKIA that he/it (respectively) had at all times acted in good faith and with the utmost professional integrity, and would continue in the future to act in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK Entity (the '**Warranty**').

1

6.    Clause 3.2 of the Settlement Agreement further provided as follows:

> "*The payment made to HeavyLift pursuant to this Settlement Agreement is* **made in reliance on this express warranty** *and confirmation.*
>
> *For the purposes of this Sub-clause, "acted in good faith" and "act in good faith" each means (1) participating in conduct which meets the standard expected of reasonable business persons in the context and including acting in ways which were or are, or are likely to be, non-detrimental to the interests of RAKIA or any other RAK Entity, and (2) not encouraging others to participate in conduct which fails to meet the standard expected of reasonable business persons in the context or acting in ways which were or are likely to be detrimental to the interests of RAKIA or any other RAK Entity and (3) not participating in any illegal activity.*
>
> *In this Agreement "RAK Entity" shall mean any entity in which RAKIA or the Government of RAK has a shareholding interest (irrespective of where that entity may be incorporated)*". [Emphasis added]

7.    RAKIA will rely on the Settlement Agreement at trial for its full terms and legal effect.

### MR AZIMA'S MISCONDUCT

8.    In fact, at the time that he gave the Warranty, Mr Azima had committed the following particular acts of misconduct against RAKIA:

### PARTICULARS OF MR AZIMA'S MISCONDUCT

*(1) Bribes / secret commissions connected with sale of the* Sheraton *Metechi Palace Hotel*

8.1.    On 8 October 2011, Ras Al Khaimah Investment Authority Georgia LLC ('**RAKIA Georgia**'), a company incorporated in the Republic of Georgia through which RAKIA owned the Sheraton Metechi Palace Hotel in Tbilisi, Georgia (the '**Hotel**'), entered into a Memorandum of Understanding with Eurasia Hotel Holdings Limited ('**Eurasia**'), a company beneficially owned by, *inter alia*, Mr Houshang Hosseinpour, pursuant to which RAKIA Georgia agreed (subject to the negotiation and execution of a sale and purchase agreement) to sell the Hotel to Eurasia for the sum of US$62.5 million (the '**Memorandum of Understanding**').

2

8.2.    On 25 October 2011, Dr Khatter Massaad ('**Dr Massaad**'), the former CEO of RAKIA and a former government official of the emirate of Ras Al Khaimah, caused RAKIA to enter into a contract with Mr Azima entitled 'Master Referral, Commission and Services Agreement' (the '**Referral Agreement**'). A true copy of the Referral Agreement is appended to these particulars of claim at appendix 2.

8.3.    The Referral Agreement recited that Mr Azima had referred to RAKIA certain third parties, including Mr Hosseinpour, Mr Houshang Farsoodeh, Mr Pourya Nayebi, New York General Trading, Merchant Savings and Loan Limited, and their affiliated and associated companies, in connection with a sale by RAKIA of the Hotel. Pursuant to the Referral Agreement, it was agreed that Mr Azima would receive a commission of 5% of the sale price of the Hotel (the '**Referral Fee**').

8.4.    Clause 1 of the Referral Agreement provided as follows:

> "*DUTIES OF AZIMA*
>
> [Mr Azima] *warrants that he has:*
>
> *(a) provided all relevant information to date in his possession which relates to the Hotel Transaction...; and*
>
> *(b) acted in good faith and with the utmost professional integrity and in the best interests of RAKIA in any transaction with third parties relating to the Hotel Transaction...*" (the '**Referral Agreement Warranties**').

8.5.    Prior to having entered into the Referral Agreement, and unbeknown to RAKIA, Mr Azima had reached an agreement or understanding with Mr Hosseinpour that, upon completion of the sale of the Hotel to Eurasia, Mr Azima would receive, for a nominal sum of 10 US dollars, a 10% interest in the Hotel (an interest worth US$6.25 million on the basis of the Memorandum of Understanding) (the '**Eurasia Secret Commission**'). Mr Azima did not disclose the existence of the Eurasia Secret Commission to RAKIA, but RAKIA became aware of its existence from a publicly available unexecuted copy of a written agreement between Mr Azima and Eurasia which, if executed, would have given contractual effect to the Eurasia Secret Commission, and which RAKIA infers was executed by Mr Azima and Eurasia on 10 October 2011.

8.6.    In breach of the Referral Agreement Warranties, and in breach of his duty pursuant to the

3

Referral Agreement to act in good faith and with the utmost professional integrity in the best interests of RAKIA, Mr Azima:

(a)     Failed to disclose to RAKIA the existence of the Eurasia Secret Commission.

(b)     Failed thereby to disclose to RAKIA that he stood to make a significant personal profit from the sale of the Hotel, above and beyond the payment of the Referral Fee.

8.7.    Further, in around November 2011, RAKIA paid AAA Investments Limited ('**AAA Investments**'), a Gibraltar company wholly owned by Mr Azima, US$400,000 on account of the Referral Fee

8.8.    By an invoice dated 10 January 2012, AAA Investments invoiced RAKIA in the sum of US$3,125,000, being 5% of the sale price for the Hotel. On 12 January 2012, AAA Investments issued a revised invoice to RAKIA ('**the Invoice**') in the sum of US$1,162,500 for "*services rendered in respect of the sale*" of the Hotel, at 2.5% of the sale price (being a total sum of US$1,562,500, credit being given for the sum of US$400,000 paid in November 2011).

8.9.    The sum of US$1,162,500 demanded by the Invoice was paid by RAKIA to AAA Investments account at the National Westminster Bank, 1-4 Berkeley Square House, London W1X 6AX on 18 January 2012.

8.10.   On the same day, and at Mr Azima's direction, payments were made by wire transfer from the AAA Investments account at National Westminster Bank to individuals and entities connected with Mr Azima. Further, a payment of US$500,000 was made to Dr Massaad personally (the '**Massaad Bribe**').

8.11.   The payment of the Massaad Bribe demonstrates the existence of an agreement or understanding between Mr Azima and Dr Massaad that, following receipt of the Referral Fee by AAA Investments, AAA Investments would pay a bribe or secret commission on Mr Azima's behalf to reward Dr Massaad for his having caused RAKIA to enter into the Referral Agreement with Mr Azima.

8.12.   As Mr Azima well knew, payment of a bribe or secret commission to Dr Massaad constituted a serious breach of Dr Massaad's fiduciary duties to RAKIA and a breach of his obligations of trust and confidence as a government official of RAK, and that the payment of a bribe or secret commission to Dr Massaad was directly contrary to the interests of RAKIA

4

as Dr Massaad's principal.

*(2) Sham joint venture proposal*

8.13.    In late 2015, Mr Azima proposed to RAKIA a joint venture with Global Defence Services Corporation ('GDS'), a Delaware company beneficially owned by him.

8.14.    By a written proposal dated 28 December 2015, which he emailed to Mr Jamie Buchanan on behalf of RAKIA, Mr Azima described the proposed joint venture as follows:

   (a)    A special purpose vehicle would be formed, to be called GDS Middle East, and to be held, as to 60% by GDS, and as to 40% by RAKIA.

   (b)    The assets to be placed into the SPV would include two King Air aircraft valued at US$17 million each, and two Falcon aircraft valued at US$9,332,626 each, giving the assets of the proposed joint venture a total value of US$52,665,252.

   (c)    For its 40% stake in the proposed joint venture, RAKIA would contribute the sum of US$21,066,100, being 40% of the purported value of the aircraft to be acquired.

   (d)    In addition, RAKIA would contribute working capital of US$2 million, being 40% of the working capital purportedly required by the joint venture.

   (e)    Following payment of the said sums, GDS would transfer the aircraft to the SPV free of liens and encumbrances.

8.15.    In fact, as Mr Azima well knew at the time, but which fact he deliberately and dishonestly failed to disclose to RAKIA, GDS was secretly planning to acquire the aircraft referred to in the joint venture proposal for about US$1.5 million each, for a total cost of about US$6 million.

8.16.    For these reasons, Mr Azima was aware that the joint venture proposal submitted by GDS to RAKIA grossly overstated the value of the aircraft that would be acquired by the joint venture SPV, and that, if RAKIA had participated in the joint venture on the terms proposed by Mr Azima, it would have contributed approximately US$20 million more than would have been fair to acquire its interest in the joint venture.

8.17.    In an email dated 26 January 2016 from Mr Dawayne Lepper to Mr Ray Adams copied to Mr Azima, Mr Lepper referred to the proceeds of the joint venture and said that the intention

5

was to, "[d]*istribute the 10M, have a cocktail and laugh about this*".  By this, Mr Lepper intended that of the sums being contributed to the joint venture by RAKIA a sum of US$10 million would be misappropriated by, inter alia, Mr Azima.

8.18.    Further, Mr Azima deliberately and dishonestly made or failed to correct a series of false representations made to Mr Buchanan, which were designed to induce RAKIA to commit to the proposed joint venture:

(a)    In an email dated 25 January 2016, copied to Mr Azima, Mr Lepper, on behalf of GDS, represented that GDS was a licensed weapons dealer. As Mr Azima well knew, this was false: GDS was not at that time a licensed weapons dealer.

(b)    Mr Lepper provided Mr Buchanan with a document entitled 'Technical Assistance Agreement', which purported on its face to be a document issued by the US Department of State – Directorate of Defence Trade Controls. As Mr Azima well knew, this document was not produced or approved by the US Department of State, and Mr Lepper had (it is inferred with Mr Azima's knowledge and approval) simply copied and pasted the US Department of State's logo into the document.

(c)    In an email dated 12 February 2016, copied to Mr Azima, Mr Lepper represented to Mr Buchanan that he was working to obtain the approval of the US Government for GDS' participation in the proposed joint venture. As Mr Azima well knew, this was false: no such application for US Government approval was made.

(d)    On divers occasions, Mr Azima represented to Mr Buchanan that the proposed joint venture had the 'backing' of the US Government, including that the US Government would sponsor and support the proposed joint venture, and would serve as its ultimate customer. As Mr Azima well knew, this was false: the US Government had offered no support to the proposed joint venture.

8.19.    For these reasons, the proposal by Mr Azima that RAKIA participate in a joint venture with GDS was in substance a dishonest attempt to misappropriate approximately US$20 million from RAKIA, by falsely stating the true value of the assets to be acquired by the proposed joint venture, and by giving the false and misleading impression that the proposed joint venture was commercially viable on the grounds that it had been evaluated and approved by the US Government, when it had not.

6

9. By virtue of the acts of misconduct pleaded to at paragraph 8 above, and as he well knew, Mr Azima had not at all times acted in good faith and with the utmost professional integrity in his dealings with RAKIA, in that he had:

   9.1. Participated in conduct which did not meet the standard expected of a reasonable business person;

   9.2. Acted in ways which were or were likely to be detrimental to the interests of RAKIA and RAKIA Georgia;

   9.3. Encouraged others to participate in conduct which failed to meet the standard expected of reasonable business persons;

   9.4. Encouraged others to act in ways which were or were likely to be detrimental to the interests of RAKIA and RAKIA Georgia; and

   9.5. Participated in illegal activity, in particular in acts of fraud and of fraudulent misrepresentation, and in the paying of a bribe.

## BREACH OF CONTRACT

10. By reason of the matters pleaded to at paragraph 8 and 9, Mr Azima breached the Warranty and was in breach of contract.

11. As a result of Mr Azima's breach of contract, RAKIA has suffered loss and damage:

### PARTICULARS OF LOSS AND DAMAGE

   11.1. But for Mr Azima's said breach of the Warranty, RAKIA would not have entered into the Settlement Agreement, and would not have paid the settlement sum or any part of it to HeavyLift.

   11.2. Accordingly, by reason of Mr Azima's breach of contract, RAKIA has lost the sum of US$2.6 million.

## FRAUDULENT MISREPRESENTATION

12. In the alternative, by agreeing to the Warranty Mr Azima represented to RAKIA in order to induce it to enter into the Settlement Agreement that he had at all times acted in good faith and with the utmost professional integrity in his dealings with RAKIA or other RAK Entities ('**the Representation**').

7

13. In entering into the Settlement Agreement, and in paying the settlement sum of US$2.6 million to HeavyLift, RAKIA expressly relied upon the Representation.

14. In fact, by reason of the matters pleaded to at paragraphs 8 and 9 above, the Representation was false.

15. Further, and in circumstances in which he was aware of his own acts of misconduct as particularised at paragraphs 8 and 9 above, Mr Azima knew that the Representation was false at the time that he made it.

16. For these reasons, the Representation was made by Mr Azima knowing that it was false and, as a result, was made fraudulently.

17. As a result of Mr Azima's fraudulent misrepresentation, RAKIA has suffered loss and damage.

## PARTICULARS OF LOSS AND DAMAGE

17.1. If the Representation had not been made, RAKIA would not have entered into the Settlement Agreement, and would not have paid the settlement sum or any part of it to HeavyLift.

17.2. Accordingly, by reason of Mr Azima's fraudulent misrepresentation, RAKIA has lost the sum of US$2.6 million.

### INTEREST

18. Pursuant to section 35A of the Senior Courts Act 1981, the Claimants seek interest as follows:

18.1. On the sum of US$2.6 million payable as damages, as pleaded to at paragraphs 10 to 17 above, interest is claimed from 7 April 2016 to 30 September 2016 at a rate of 8% per annum simple, in the sum of US$99,840.00 (or its sterling equivalent) and continuing at a daily rate of US$569.86 (or its sterling equivalent) until judgment or earlier payment.

18.2. Alternatively, interest is claimed for such periods, and at such a rate or rates, as the court in its discretion thinks just.

### STERLING VALUE OF CLAIM

19. This claim is for payment of sums in United States dollars. The claim is made for payment in a foreign currency because the Claimants have suffered losses, as particularised above, in that currency.

20. Using the exchange rate of GBP:USD £1:$1.30, the sterling equivalent of the sums claimed at the date

8

of issue is £2,076,800.00.

**AND the Claimant claims:**

(1)     Damages for breach of contract.

(2)     Damages for fraudulent misrepresentation.

(3)     Interest, as particularised at paragraph 18 above.

(4)     Further or other relief.

(5)     Costs.

HUGH TOMLINSON QC

ANDREW HOLDEN

Statement of truth

I believe that the facts stated in this statement of case are true.

I am duly authorised to sign this statement of case on behalf of the Claimant.

Signed:

Name: David Graham Hughes

Position: Partner

Date: 30 September 2016

9

# APPENDIX 1

Execution Copy

**DATED**     2 MARCH     ~~FEBRUARY~~ 2016

## (1) RAK INVESTMENT AUTHORITY

## (2) HEAVYLIFT INTERNATIONAL AIRLINE

## (3) FARHAD AZIMA

---

## SETTLEMENT AGREEMENT

---



**Dechert**
LLP

160 Queen Victoria Street
London EC4V 4QQ, UK
Tel: +44 (0) 20 7184 7000
Fax: +44 (0) 20 7184 7001

368339.5

**THIS AGREEMENT** is made on    2    M A R C H    ~~February~~ 2016

**BETWEEN:**

(1)     **RAK INVESTMENT AUTHORITY** of PO Box 31291, Jazeera Al Hamra, RAK, UAE ("**RAKIA**"); and

(2)     **HEAVYLIFT INTERNATIONAL AIRLINES** of PO Box 9061, Sharjah, United Arab Emirates ("**HeavyLift**"), and

(3)     **FARHAD AZIMA** of 5921 Ward Parkway, Kansas City, Missouri 64113, USA    ("**Mr Azima**");

         (together, the "**Parties**")

**WHEREAS:**

(A)     By an agreement dated 12 April 2007, HeavyLift and RAK Airways PJSC ("**RAK Airways**") entered into a joint venture (the "**Joint Venture Agreement**") to establish an Aircraft Simulator and Training Facility at Ras Al Khaimah International Airport, located in Ras Al Khaimah, UAE ("**RAK**");

(B)     RAKIA guaranteed the performance of RAK Airways under the Joint Venture Agreement;

(C)     HeavyLift, acting through Mr Azima, has asserted that RAK Airways owes HeavyLift for investments HeavyLift made in the joint venture pursuant to the Joint Venture Agreement;

(D)     RAKIA does not agree that there is any legal basis for any such claim;

(E)     Mr. Azima has recently provided negotiation assistance to RAKIA on an informal basis which RAKIA recognises and appreciates;

(F)     Each Party has the greatest of respect for the other Parties, and wishes to resolve all outstanding issues relating to the Joint Venture Agreement.

**IT IS AGREED** as follows:

**1.      PAYMENT**

1.1     RAKIA will pay HeavyLift the sum of $2,600,000 to resolve all claims which Mr Azima or HeavyLift may have against it or any other RAK Entity as further detailed in paragraph 3.1.

1.2     The payment shall be made by wire transfer to the following account by within 30 (thirty) days of the signing of this Settlement Agreement:

     1.2.1     American Bank and Trust Co, 6060 American Plaza, Tulsa, OK 74135

           ABA Routing No: 1039-0156-9

           Account name: Heavylift International Airlines

           Account Number: 72694

## 2.     EFFECT OF THIS AGREEMENT

This Settlement Agreement shall immediately be fully and effectively binding on the Parties in accordance with its terms.

## 3.     SETTLEMENT AND WARRANTY

3.1     This Settlement Agreement is in full and final settlement of all claims, in any jurisdiction, whether or not presently known to them or to the law that Mr Azima or HeavyLift or any of its owners has had, shall or may have against RAKIA, RAK Airways or any other RAK Entity.

3.2     Mr Azima and HeavyLift each expressly and separately warrants and confirms to RAKIA that he/it (respectively) has at all times acted in good faith and with the utmost professional integrity and will continue in the future to act in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK Entity:

The payment made to HeavyLift pursuant to this Settlement Agreement is made in reliance on this express warranty and confirmation.

For the purposes of this Sub-clause, **"acted in good faith"** and **"act in good faith"** each means (1) participating in conduct which meets the standard expected of reasonable business persons in the context and includes acting in ways which were or are, or are likely to be, non-detrimental to the interests of RAKIA or any other RAK Entity, and (2) not encouraging others to participate in conduct which fails to meet the standard expected of reasonable business persons in the context or acting in ways which were or are likely to be detrimental to the interests of RAKIA or any other RAK Entity and (3) not participating in any illegal activity.

In this Agreement "RAK Entity" shall mean any entity in which RAKIA or the Government of RAK has a shareholding interest (irrespective of where that entity may be incorporated).

## 4.     NO ADMISSION

This Settlement Agreement is not, and shall not be represented or construed by any Party as, an admission of liability or wrongdoing on the part of any Party to this Settlement Agreement or

any other person or entity or the acceptance or rejection of the validity of any agreements agreed or concluded between the Parties before this date.

## 5.   CONFIDENTIALITY AND NON-DISPARAGEMENT

5.1   The existence and terms of this Settlement Agreement, and the substance of all negotiations in connection with it, are confidential to the Parties and their advisers, who shall not disclose them to any third party without the written consent of the other Parties other than:

5.1.1   by RAKIA to its senior management (or the senior management of any RAK Entity), or by any Party to its auditors, insurers and lawyers on terms which preserve confidentiality;

5.1.2   pursuant to an order of a court of competent jurisdiction or pursuant to any proper order or demand made by any competent authority or body such that a Party is under a legal or regulatory obligation to make such a disclosure;

5.1.3   as far as necessary to implement and enforce any of the terms of this Settlement Agreement; and

5.1.4   to issue an agreed statement to their employees and shareholders in terms pre-agreed by the other Parties.

5.2   Each Party agrees not to disparage any other Party or any other RAK Entity. In particular, the Parties shall not at any time publish or otherwise make any statement concerning any other Party and/or any other RAK Entity which is derogatory or disparaging or which is intended to or could reasonably be expected to lower their respective reputations.

## 6.   INVALIDITY

If at any time any one or more of the provisions of this Deed is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity and enforceability of the remaining provisions of this Settlement Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall be in any way affected or impaired as a result.

## 7.   GOVERNING LAW AND JURISDICTION

This Settlement Agreement and any dispute or claim arising out of, or in connection with, it or its subject matter or formation (including, without limitation, any contractual or non-contractual

368339.5

4

disputes, claims or obligations) is governed by and shall be construed in accordance with English law and the Parties submit to the exclusive jurisdiction of the courts of England and Wales.

This Settlement Agreement has been executed as a Deed and is delivered and takes effect on the date stated at the beginning of it.

**EXECUTED** as a deed by **RAK Investment Authority** acting by
_____, a director and,
~~Jones Boettcher~~ director /its secretary

Director
NASER ALBUSTAMI

[Director/Secretary]

M. R. Ziegler
MICHAEL ZIEGLER

NEIL SHARRARD
DECHERT LLP
LONDON

**EXECUTED** as a deed by **HEAVYLIFT INTERNATIONAL AIRLINES** acting by:

FARHAD AZIMA..., director; and

RAY ADAMS ..... director/ company

secretary

Director

[Director/Secretary]

**EXECUTED** as a deed by **FARHAD AZIMA**
in the presence of:

Name: RAY ADAMS

Address: 11349 BUENA VISTA ST., LEAWOOD, KS 66211

Signature: ...............

368339.5

017

5

# APPENDIX 2

**THIS MASTER REFERRAL, COMMISSION AND SERVICES AGREEMENT** is dated 25 October, 2011

**BETWEEN:**

(1) **RAS AL KHAIMAH INVESTMENT AUTHORITY,** duly organised and incorporated under the laws of the UAE and the Emirate of Ras Al Khaimah pursuant to Emiri Decree No. 2 of 2005 and wholly owned by the Government of Ras Al Khaimah ("**RAKIA**"); and

(2) **FARHAD AZIMA,** a national of United States of America holding passport number 423045237 ("**AZIMA**").

**WHEREAS:**

AZIMA has referred to RAKIA (the "**Referral**") Houshang Hosseinpour, Houshang Farsoodeh, Pourya Nayebi, New York General Trading, Merchants Savings and Loan Limited, and their affiliated and associated companies and others (individually and collectively the "**Referred Parties**") with respect to the proposed sale of the RAKIA assets in Georgia, including, but not limited to the Sheraton Metechi Palace Hotel in Tbilisi, Georgia (the "**Hotel Transaction**") and the Poti Free Zone in Poti, Georgia (the "**Free Zone Transaction**"), and RAKIA and AZIMA are entering into this Agreement to confirm the terms of the Referral.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

**1      DUTIES OF AZIMA**

AZIMA warrants that he has:

(a) provided to RAKIA all relevant information to date in his possession which relates to the Hotel Transaction and the Free Zone Transaction; and

(b) acted in good faith and with the utmost professional integrity and in the best interests of RAKIA in any transaction with third parties relating to the Hotel Transaction and the Free Zone Transaction.

**2      FEE**

2.1    In consideration for the Referral and the services provided by AZIMA in performing his obligations and duties as set out in this Agreement to the reasonable satisfaction of RAKIA, RAKIA shall pay AZIMA a referral fee equal to five percent (5.00%) of the gross sales price of the Hotel Transaction and the Free Zone Transaction (the "**Referral Fee**").

2.2    The Hotel Transaction and the Free Zone Transaction are separate transactions and neither is contingent on the other and the Referral Fee on each shall be paid separately.

**3      EXPENSES**

3.1    The Referral Fee shall be exclusive of all expenses (the "**Expenses**") that have been incurred or will be incurred by AZIMA in relation to the Hotel Transaction and the Free Zone Transaction and such Expenses shall be billed and paid separately.

1

CR08709462

**4     CONFIDENTIALITY**

AZIMA and RAKIA agree that this Agreement and the terms hereof and of the Hotel Transaction and the Free Zone Transaction shall remain confidential between them and shall not be disclosed to any third party without the prior written consent of both AZIMA and RAKIA.

**5     TERM AND TERMINATION**

This Agreement shall terminate upon AZIMA fulfilling his obligations under this Agreement and upon payment of the Referral Fee and the Expenses.

**6     NOTICES**

6.1     Any notice or communication from either party to the other shall be made in writing, be delivered by express prepaid courier or by fax , and will be deemed to have been received by the recipient either immediately upon delivery by hand, at the time of service or delivery or simultaneously with transmission if sent by facsimile; in each case, addressed to the recipient at its address specified hereunder, or such other address as will have been designated by one party by written notice to the other party.

6.2     Notices, requests, demands and other communications required or otherwise contemplated to be made under this Agreement shall be delivered or sent as follows:-

If to RAKIA:

| | |
|---|---|
| Address: | PO Box 31291, Jazeera Al Hamra, RAKIA Office, 2nd Floor, Ras Al Khaimah, United Arab Emirates, marked to the attention of Karam Al Sadeq. |
| Facsimile: | +971 4 [363 7324] |

If to Azima:

| | |
|---|---|
| Address: | Farhad Azima |
| | 8080 Ward Parkway, Suite 407 |
| | Kansas City, Missouri 64114-2020 USA, |
| | marked to the attention of Farhad Azima |
| Facsimile: | +1 (816) 931-8200 |

**7     GENERAL**

7.1     This Agreement constitutes the entire agreement between the parties relating to the subject matter of this Agreement and supersedes all previous agreements whether written or otherwise.

7.2     The relationship between the parties does not constitute a partnership and nothing in this agreement shall constitute or be deemed to constitute a partnership between the Parties and none of them shall have any authority to bind the others as partners in any way.

**8     COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which when executed shall constitute an original instrument, but all the counterparts together shall constitute one and the same instrument.

2

CR08709462

**9      GOVERNING LAW AND DISPUTE RESOLUTION**

9.1     This Agreement shall be governed by and construed in accordance with the laws of England and the English courts shall have exclusive jurisdiction to settle any dispute arising out of or in connection with it and the parties submit to the exclusive jurisdiction of the English courts.

**10     LANGUAGE**

This Agreement is executed in the English language. In the event that this Agreement is translated into any other language the English language version shall always prevail.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed on the date first above written.

**SIGNED** by RAKIA                              )

                                                                    Authorised signatory

**SIGNED** by     FARHAD AZIMA         )

3

CR08709462

021

Claim No: HC-

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

BETWEEN:

### RAS AL KHAIMAH INVESTMENT AUTHORITY

*Claimant*

- and -

### FARHAD AZIMA

*Defendant*

---

### PARTICULARS OF CLAIM

---

Solicitors for the Claimant

Dechert LLP

160 Queen Victoria Street

London EC4V 4QQ

Tel: 0207 184 7001

Ref: 976749/137564

10