**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FARHAD AZIMA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:16-CV-01948-KBJ |
| RAK INVESTMENT AUTHORITY, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER TO PRECLUDE FURTHER DISSEMINATION AND USE OF STOLEN DOCUMENTS**

Kirby D. Behre (D.C. Bar # 398461)
Timothy O'Toole (D.C. Bar # 469800)
Charles F. B. McAleer. Jr. (D.C. Bar # 388681)
Ian A. Herbert (D.C. Bar # 1019902)
Miller & Chevalier Chartered
900 16th Street, NW
Washington, D.C. 20006
Tel: (202) 626-5800
Fax: (202) 626-5801
Email: kbehre@milchev.com
Email: totoole@milchev.com
Email: cmcaleer@milchev.com
Email: iherbert@milchev.com

*Counsel for Plaintiff Farhad Azima*

Dated: April 17, 2017

Defendant RAKIA opposes Plaintiff's request for a protective order to prevent the further dissemination of Plaintiff's stolen emails and data. Defendant instead argues that it should be "free to use and disseminate [the stolen and likely privileged data] as it sees fit." Mem. of Law in Supp. of Def.'s Opp'n. to Mot. for Protective Order at 4, (Apr. 11, 2017) (ECF No. 24) (hereinafter "ECF No. 24"). In other words, Defendant seeks the unfettered use and distribution of approximately 30 gigabytes of unquestionably stolen documents that Defendant itself is alleged to have stolen. The fact that the stolen data almost certainly contain attorney client privileged communications only underscores the recklessness with which Defendant seeks to treat the stolen material.

Inexplicably, Defendant's Opposition relies upon an expert declaration which undermines one of the central tenants of Defendant's basis for opposing a Protective Order. Defendant's Opposition hinges in part on its claim that the stolen emails and data are publically available, allegedly making a protective order futile or unnecessary. Leaving aside Defendant's alleged involvement in placing the data on the dark web in the first place, Defendant's own expert declaration establishes that the vast majority of the stolen data is not publically available.

Defendant misleadingly claims in its Opposition that "many" of the stolen documents can be downloaded, ECF No. 24 at 9, yet the attached declaration it cites in support confirms that Defendant's UK-based expert was unable to download approximately 85 percent of the documents that Defendant states that it possesses. ECF No. 24-1 at ¶¶ 25, 26 (expert was unable to obtain 25.7 GB of data). It continues to be the case – seven months after the stolen data was posted on the dark web – that nobody has been able to download the bulk of the hacked data

from the dark web other than Defendant and/or its counsel.[1] This troubling fact looms large over this case.

Defendant's other arguments – that Mr. Azima's request would restrict a court in the UK from addressing the use of the stolen data in that case, affect Defendant's ability to consult with counsel, and implicate the First Amendment – are preposterous. These allegations mischaracterize the proposed order, which only seeks to restrict Defendant and its counsel's distribution of known-stolen documents, including privileged material. Indeed, Plaintiff's proposed order was specifically drafted to include, within the term "Parties," each party's "respective employees, attorneys and agents," which, for now, would not restrict internal deliberations but rather external dissemination. *See* Pl.'s Mot. for Protective Order to Preclude Further Dissemination and Use of Stolen Documents at 2, (Mar. 28, 2017) (ECF No. 23-1) (hereinafter "ECF No. 23"). The court should adopt Mr. Azima's properly tailored Order and preserve the status quo until Mr. Azima is given the opportunity to prove his claim.

## FACTUAL BACKGROUND

As described in the complaint, in 2015, Defendant asked Mr. Azima to help it settle a dispute with its former CEO Khater Massaad. Complaint at ¶ 6, (Sept. 30, 2016) (ECF No. 1) (hereinafter "Compl."). During discussions between Mr. Azima and Defendant to resolve a commercial business venture, Defendant's counsel said:

> [A]ny settlement [between Plaintiff and Defendant regarding that venture] is more in recognition of the support and assistance Mr Azima is offering to RAK in settling matters with KM and SI as well as, potential new business ventures currently under discussion.

[1] Defendant's expert concludes that there is no reliable data on whether anyone has successfully downloaded Mr. Azima's stolen data. ECF No. 24-1 at 9 n.10.

*See* Exhibit A. This email from Defendant's counsel makes clear that the relationship between Defendant and Mr. Azima was a commercial relationship on several levels. For more than a year, Mr. Azima expended extensive time and money to help Defendant resolve its dispute by serving as a mediator. Compl. at ¶ 6.

In July 2016, Defendant's counsel Neil Gerrard became enraged that Massaad would not agree to the terms of settlement proposed by Defendant. At a meeting in London on or about July 23, 2016, Gerrard threatened Azima that Azima would be "collateral damage" in Defendant's war against Massaad. Compl. at ¶¶ 7-8. Within two weeks of that threat, two new websites were launched with links to torrent sites that allegedly contain at least approximately 30 gigabytes of Mr. Azima's stolen data.[2] Defendant's Opposition to the proposed protective order is simply more of the same: a continuing effort to cause further "collateral damage" to Mr. Azima by distributing stolen data far and wide.

Shortly after learning that Defendant and its counsel were in possession of Mr. Azima's stolen data, Mr. Azima's counsel alerted Defendant's counsel that the stolen data likely[3] contained privileged material, and requested that privileged communications be returned to Mr.

---

[2] Defendant's expert concludes that Mr. Azima's stolen data was not referenced or available prior to August 4, 2016, two weeks after Mr. Gerrard's threat, ECF No. 24-1 at ¶ 20, and that the torrent links containing Mr. Azima's stolen and privileged data were predominately aggregated on these sites, *id*. at ¶ 19.

The Defendant's expert also claims that the benefit of using Bit Torrent is that it allows multiple computers to download and upload data at the same time, making the download more efficient. *See* ECF No. 24-1 at ¶ 13. But the expert found no more than one or two "seeders" for any of the files containing Mr. Azima's data. *See* ECF No. 24-1 at ¶¶ 31, 38. In that situation, it is hard to see what efficiency benefit torrent sites provide. The expert hints at one other potential benefit: BitTorrent allows users to stay anonymous, which is why it "has risen to great popularity as a tool to facilitate the illegal trafficking of copyright infringing works." *See* ECF No. 24-1 at ¶ 12.

[3] Defendant has refused to provide Mr. Azima with a complete copy of the stolen data in Dechert's possession, so counsel cannot be certain that the stolen data Dechert has contains privileged material. But counsel has reviewed Mr. Azima's data that is still in Mr. Azima's possession, and it includes numerous privileged commutations over a multi-year period.

Azima. Pl.'s Mot. to Seal Ex. E, at Ex. 2 (Dec. 15, 2016) (ECF No. 14) (hereinafter "ECF No. 14"). Defendant's counsel did not address whether they were in possession of any of Mr. Azima's privileged communications, and has failed to return any privileged data. ECF No. 14-3. Defendant's counsel now recklessly (and ironically) claims that the privileged documents it possesses may no longer retain privileged status, despite the fact that the documents were stolen from him and he has not waived the privilege, and once again they refuse to return Mr. Azima's privileged documents. *See* Exhibit B.[4]

Recently, a reporter contacted Mr. Azima claiming to be in possession of the stolen documents. The reporter stated that he (like everyone other than Defendant and its counsel) is unable to download the stolen data from the torrent sites.[5]

Mr. Azima approached Defendant about this latest dissemination of his stolen documents. In response to Defendant's request, Mr. Azima provided Defendant with a proposed order. ECF No. 24-3 at 7. Defendant did not reject the idea of a protective order, but instead provided edits to Mr. Azima's draft. Over the course of a week, Mr. Azima sent Defendant two additional drafts of the proposed order that responded to Defendant's proposed edits and concerns. *See* ECF No. 24-3 at 3, 6. Ultimately, Defendant did not agree to any of Mr. Azima's proposed orders, which would prohibit the Defendant (and its employees, attorneys and agents) from

---

[4] The D.C. Bar has said that "counsel may violate the ethics rules if he knowingly received privileged documents, had no basis to conclude that the privilege had been waived, and reviews and uses them anyway." Ethics Opinion 318, (Dec. 2002), www.dcbar.org/bar-resources/legal-ethics/opinions/opinion318.cfm. In such circumstances, counsel "should either return the document to opposing counsel or make inquiry of opposing counsel about its status prior to determining what course of action to take." *Id*.

[5] Defendant's suspiciously narrow denial that neither "RAKIA [n]or its agents" was the source that provided the stolen data to the AP reporter raises unanswered questions. ECF. No. 24 at 4. Notably, Defendant does not deny that RAK or Dechert could have been the "source" for the reporter and it does not state how it knows that none of RAKIA's agents were the source. Defendant has hired a public relations firm to pitch derogatory stories about Mr. Azima around the globe, and Defendant's very limited denial does nothing to eliminate that firm as the source of the stolen data.

continuing to disseminate Mr. Azima's stolen, confidential, and privileged data. Rather than proposing additional changes to Mr. Azima's third draft order, Defendant pulled the plug on the negotiation, leading to Mr. Azima's motion. *See* ECF No.24-3 at 2.

**ARGUMENT**

**1. Defendant's own Opposition makes clear that this Court has the authority to prevent the further dissemination of the stolen documents.**

Defendant has the temerity to argue that this court is powerless to stop Defendant from using and disseminating the documents "as it sees fit," ECF No. 24 at 4, while admitting that courts may exercise their inherent authority with respect to documents obtained outside the discovery process "where the documents could be used unfairly in the proceeding before the court." ECF No. 24 at 7 (citing *Cabotag v. Ohio Hosp. for Psychiatry, LLC*, No. 2:11-CV-50, 2012 WL 3064116, at *3 (S.D. Ohio July 27, 2012)). Indeed, "[f]ederal courts have authority to remedy litigation practices that threaten judicial integrity and the adversary processes[, and] the 'district court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it.'" *In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La.), *amended on reconsideration in part*, No. CIV. A. 88-1935, 1992 WL 275426 (E.D. La. Sept. 29, 1992), and *amended*, 144 F.R.D. 73 (E.D. La. 1992). It is true that in order to exercise this inherent authority, "the court must find some connection between the sanctioned conduct and a process of the court in the litigation before it." *Alexander v. F.B.I.*, 541 F. Supp. 2d 274, 303 (D.D.C. 2008). But where, as here, the conduct at issue is directly relevant to the underlying litigation, *i.e.*, the theft, possession, misuse and dissemination of Plaintiff's data, the court should exercise its inherent authority to "prevent abuses of the judicial process." *Shepherd v. ABC*, 62 F.3d 1469, 1474 (D.C. Cir. 1995).

As Defendant's own expert declaration plainly establishes, the vast majority of the stolen documents in Defendant's possession (approximately 85 percent) is not publicly available. ECF No. 24-1 at ¶ 26. Defendant's expert also concludes that there is no reliable data on whether anyone has successfully downloaded the 25.7 GB of data that he was unable to download. ECF No. 24-1 at n.10 (admitting the total number of torrent file downloads may overstate the number of people who have actually been able to download Mr. Azima's stolen data).[6] Defendant implicitly admits that it has already distributed the stolen documents to other parties. *See* ECF No. 24-3 at 2 (expressing concern that the order would prevent them from sending the documents to "anyone else to whom my client might have disclosed the documents."). Defendant's persistent attempts to put Mr. Azima's documents into the public record by disseminating the stolen documents "as it sees fit" are designed to make it appear (contrary to what their own expert found) that the documents are publicly available and undermine the proceedings in this Court. In other words, the very defense Defendant offers to the underlying allegations derives from conditions Defendant created through its misuse and wrongful dissemination of Plaintiff's stolen data. The Court should not allow the Defendant to attempt to manipulate the court proceedings in this way.[7]

**2. Defendant's additional arguments mischaracterize the proposed order and are meritless.**

Defendant's arguments that Mr. Azima's request would restrict a court in the UK, affect Defendant's ability to consult with counsel, and implicate the First Amendment are based on a mischaracterization of the proposed order and should be easily spurned.

---

[6] Defendant's expert also concludes that the links to Mr. Azima's stolen data are predominantly found on two blogging websites that were created just two weeks after Gerrard threatened to make Mr. Azima collateral damage. *See* ECF No. 24-1 at ¶¶ 19-20.

[7] Defendant's attempt to manipulate these proceedings to their benefit increases Mr. Azima's damages.

Defendant spends much of its Opposition claiming that the proposed order would restrict its use of the documents in a foreign court when it knows from the text of the order and its correspondence with Mr. Azima that the proposed order would do no such thing.[8] Nothing in the proposed order affects what a foreign court might do with regard to any attempted use of the stolen documents. Rather, it simply requires Defendant to provide Mr. Azima notice prior to filing the documents in open court so that Mr. Azima may have an opportunity to use any processes available in that court to stop the further public dissemination of his stolen documents. *See* ECF No. 23 at 2. That request is eminently reasonable given Defendant's history of disseminating the stolen data and ongoing claims that it should be able to continue disseminate the documents "as it sees fit."[9]

Nor would the proposed order prohibit Defendant from discussing the documents with its counsel. The order defines the "Parties" to include "their respective employees, attorney and agents" and prohibits disclosure of the documents to "any other person." *See* ECF No. 23-1 at 2. It does nothing to prohibit disclosure of the documents to the "Parties" themselves. By contrast, the Defendant's proposed order would allow them to continue to disseminate the stolen documents to others who possess any portion of the stolen documents, including any individuals or entities that the Defendant has already given the documents to and whose identities Defendant

[8] In the pre-motion correspondence, Mr. Azima reiterated that he agreed to a general reservation of rights by both parties regarding future use of the documents in other proceedings. *See* ECF No. 24-3.

[9] Defendant argues that Mr. Azima has not invoked the UK's procedures for *in camera* review of evidence. ECF No. 24 at 5. However, once again its argument is undermined by its own Opposition. Defendant admits those proceedings are "at a preliminary stage" and there has been "no exchange of documents." ECF No. 24 at 7. Contrary to Defendant's claim, the hacked documents have not been "quoted in detail in the 'Particulars of Claim.'" *See* ECF No. 24 at 11 (citing ECF No. 13-9 at ¶ 8.4, 8.17). The only documents quoted in detail are a settlement agreement and the referral agreement, both of which RAKIA was a party to (both of which are contracts between RAKIA and Azima, further reflecting his extensive commercial relationship with RAKIA). The only quote of a stolen document is one innocuous phrase from one internal email.

has withheld from Plaintiff. The Court should not consider this request without any information about who the Defendants may have already distributed the documents to.[10]

Defendant's brief claim that Mr. Azima's order implicates the First Amendment deserves no more than a sentence of a response: Mr. Azima plainly has an interest in protecting the confidentiality of his stolen documents; doing so raises no First Amendment concerns.

## **CONCLUSION**

Defendant seeks to have this court endorse Defendant's ability to use Mr. Azima's stolen documents as it sees fit. However, Defendant's expert declaration establishes that the vast majority of the data in the Defendant's possession cannot be downloaded and possibly was never downloaded. Mr. Azima's order does not affect proceedings in other courts or prevent the Defendant from distributing the stolen, confidential, and privileged documents to its counsel. For these reasons, and the reasons stated in the original motion, the motion should be granted.

[10] It is odd that the Defendant feels so strongly about its need to distribute the documents beyond its employees, attorneys, and agents. Perhaps it has already distributed some portion of the documents to its public relations firm as part of its smear campaign against Mr. Azima and wants to protect its right to continue to send additional documents "as it sees fit." Because a small subset of the documents may have become available by Defendant's previous wrongful conduct, perhaps Defendant believes that in the future it will be able to direct individuals to download the available documents and then follow up by sending those individuals all unavailable stolen documents under the protection of their proposed order. Whatever the reason, the court should not allow it.

Respectfully submitted,

Dated: April 17, 2017

/s/ Charles F. B. McAleer, Jr.

Kirby D. Behre (D.C. Bar # 398461)
Timothy O'Toole (D.C. Bar # 469800)
Charles F. B. McAleer, Jr. (D.C. Bar # 388681)
Ian A. Herbert (D.C. Bar # 1019902)
Miller & Chevalier Chartered
900 16th Street, NW
Washington, D.C. 20006
Tel: (202) 626-5800
Fax: (202) 626-5801
Email: kbehre@milchev.com
Email: totoole@milchev.com
Email: cmcaleer@milchev.com
Email: iherbert@milchev.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 17th day of April, 2017, a true and genuine copy of the foregoing was sent by ECF to the following:

Linda C. Goldstein (*pro hac vice*)
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Linda.goldstein@dechert.com

D. Brett Kohlhofer (D.C. Bar # 1022963)
Dechert LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202)261-3349
d.brett.kohlhofer@dechert.com

*Attorneys for Defendant*

/s/ Charles F. B. McAleer, Jr.________
Charles F. B. McAleer, Jr.